**FREEDOM COURT REPORTING**

Page 1

1  IN THE U. S. DISTRICT COURT

2  FOR THE MIDDLE DISTRICT OF ALABAMA

3  NORTHERN DIVISION

4

5  CASE NUMBER:  2:06-CV-325-MEF

6  N.A. WATER SYSTEMS, L.L.C., as successor

7  by merger to USFILTER ENGINEERING &

8  CONSTRUCTION, INC.

9      Plaintiff,

10     Vs.

11 AUGUSTA FIBERGLASS COATINGS, INC.,

12 SYNDER INDUSTRIES, INC.,

13     Defendants.

14

15  DEPOSITION OF DARRELL ALAN OLTMAN

16

17      S T I P U L A T I O N S

18  IT IS STIPULATED AND AGREED by and

19 between the parties through their respective

20 counsel, that the deposition of DARRELL ALAN

21 OLTMAN may be taken before MICKEY TURNER,

22 Commissioner and Notary Public at the law

23 offices of Bradley, Arant, Rose & White, One

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-...**

EXHIBIT 16

**FREEDOM COURT REPORTING**

Page 62

| | | |
|---|---|---|
| 10:15:11 | 1 | who wrote this document. |
| 10:15:12 | 2 | Q. Is this a document that was produced by |
| 10:15:14 | 3 | your counsel in this litigation as coming from |
| 10:15:20 | 4 | Snyder's files? |
| 10:15:22 | 5 | MS. POWELL: I produced it. It |
| 10:15:26 | 6 | was produced by me. |
| 10:15:30 | 7 | Q. Your counsel produced the documents, but |
| 10:15:33 | 8 | who at Snyder gave your counsel the documents? |
| 10:15:35 | 9 | A. I believe the documents were given to |
| 10:15:38 | 10 | counsel -- or collected and given to counsel, |
| 10:15:41 | 11 | by Steve Hansen. |
| 10:15:41 | 12 | Q. And who is Steve Hansen? |
| 10:15:43 | 13 | A. He is our Director of Human Resources. |
| 10:15:46 | 14 | Q. And how did Steve Hansen collect the |
| 10:15:51 | 15 | documents? |
| 10:15:52 | 16 | A. By finding all sources of documents, |
| 10:15:58 | 17 | asking in sales, engineering, production, |
| 10:16:03 | 18 | everyone involved, to provide any and all |
| 10:16:07 | 19 | documents pertinent to this. |
| 10:16:09 | 20 | Q. Did that include electronic documents? |
| 10:16:11 | 21 | A. We don't keep a record of electronic |
| 10:16:15 | 22 | documents. There's no history of it. |
| 10:16:17 | 23 | Q. Do you have a computer system at Snyder |

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

Page 65

| Time | # | |
|---|---|---|
| 10:18:19 | 1 | A. They could not do anything more than put |
| 10:18:22 | 2 | their head in the doorway, basically. They |
| 10:18:24 | 3 | were not allowed access to the tank or allowed |
| 10:18:28 | 4 | access to the failed component or allowed to |
| 10:18:31 | 5 | take any pictures. |
| 10:18:32 | 6 | Q. And who was this individual? |
| 10:18:33 | 7 | A. Cullen Estes. |
| 10:18:34 | 8 | Q. Is that C-U-L-L-E-N? |
| 10:18:42 | 9 | A. C-U-L-L-E-N, yes. |
| 10:18:42 | 10 | Q. So, when Mr. Estes went to the site -- |
| 10:18:45 | 11 | when did he go to the site? |
| 10:18:48 | 12 | A. I've got a document that probably says |
| 10:18:54 | 13 | here for you. |
| 10:18:56 | 14 | MS. POWELL: Just answer. |
| 10:18:59 | 15 | MR. LEE: Just answer the |
| 10:19:00 | 16 | question. |
| 10:19:00 | 17 | A. I don't know the exact date. |
| 10:19:02 | 18 | MR. ROGERS: Does he have a |
| 10:19:03 | 19 | document? |
| 10:19:03 | 20 | Q. Do you have a document with you that |
| 10:19:05 | 21 | would help you determine that date? |
| 10:19:07 | 22 | A. I think there's a document that has been |
| 10:19:09 | 23 | produced to you that would show that date. |

**FREEDOM COURT REPORTING**

Page 66

| | |
|---|---|
| 10:19:12  1 | Q.    Would that be in the production from |
| 10:19:17  2 | Snyder Industries to us? |
| 10:19:18  3 | A.    That would be correct. |
| 10:19:18  4 | Q.    Now, you started to reach for a document |
| 10:19:21  5 | that you brought into the deposition with you, |
| 10:19:24  6 | is that correct? |
| 10:19:24  7 | A.    I started to reach for something that |
| 10:19:26  8 | was produced to you. |
| 10:19:27  9 | Q.    So, if it has been produced in this |
| 10:19:30 10 | litigation, I don't see any reason why you |
| 10:19:32 11 | can't look at it and tell me what it was, the |
| 10:19:35 12 | answer to my question. |
| 10:19:36 13 |         MS. POWELL:  Then, give us -- if |
| 10:19:37 14 | you have the documents that have been |
| 10:19:39 15 | produced, we will look through them and give |
| 10:19:42 16 | it to you. |
| 10:19:44 17 |         THE WITNESS:  Right. |
| 10:19:44 18 |         MS. ANDREEN:  He brought the |
| 10:19:45 19 | documents with him to the deposition. |
| 10:19:47 20 |         MR. ROGERS:  This is so absurd. |
| 10:19:49 21 | That man had a file folder in his hand.  The |
| 10:19:52 22 | lawyer reached over and told him not to look |
| 10:19:53 23 | at it. |

**FREEDOM COURT REPORTING**

Page 67

| | | |
|---|---|---|
| 10:19:54 | 1 | MR. LEE: That's exactly right. |
| 10:19:57 | 2 | MR. ROGERS: Well, the document |
| 10:19:57 | 3 | is in the room. Let's go ahead and have him |
| 10:19:59 | 4 | look at it. We're not going to have him paw |
| 10:20:01 | 5 | through the document production. You've |
| 10:20:03 | 6 | already done that with him this morning |
| 10:20:05 | 7 | outside of our presence. |
| 10:20:07 | 8 | MR. LEE: If you've got a |
| 10:20:08 | 9 | document you want to show him, that's fine. |
| 10:20:10 | 10 | MR. ROGERS: We want everything |
| 10:20:11 | 11 | in his briefcase, then. |
| 10:20:13 | 12 | MR. LEE: Well, you're not going |
| 10:20:15 | 13 | to get it. You're not going to get it. |
| 10:20:16 | 14 | MS. ANDREEN: He bought it to |
| 10:20:18 | 15 | the deposition. This is a 30(b)(6) and a |
| 10:20:22 | 16 | 30(b)(5) to bring documents in his possession |
| 10:20:25 | 17 | to this deposition. |
| 10:20:25 | 18 | MR. LEE: You've already |
| 10:20:26 | 19 | questioned him about whether he had any |
| 10:20:26 | 20 | documents to be produced and they've already |
| 10:20:30 | 21 | been produced. |
| 10:20:31 | 22 | Q. Can you answer the question, my original |
| 10:20:33 | 23 | question, when was Cullen Estes at the site? |

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

**FREEDOM COURT REPORTING**

Page 68

| Time | # | |
|---|---|---|
| 10:20:39 | 1 | A.  I do not know the exact date. |
| 10:20:41 | 2 | Q.  Do you know the approximate date? |
| 10:20:43 | 3 | A.  I know it was in late 2003. |
| 10:20:45 | 4 | Q.  Late 2003? |
| 10:20:48 | 5 | MR. ROGERS: Before the spill? |
| 10:20:50 | 6 | A.  No, after the spill. |
| 10:20:51 | 7 | Q.  What was the date of the spill? |
| 10:20:53 | 8 | A.  It was in 2003. |
| 10:20:55 | 9 | Q.  The tank was manufactured when? |
| 10:20:56 | 10 | A.  Maybe I'm confused. |
| 10:21:01 | 11 | Q.  Take your time. |
| 10:21:05 | 12 | A.  I would suggest looking back on your |
| 10:21:08 | 13 | documents that have been produced. |
| 10:21:10 | 14 | Q.  You have been designated as the 30(b)(6) |
| 10:21:19 | 15 | representative with knowledge to answer the |
| 10:21:21 | 16 | questions related to the topics set forth in |
| 10:21:26 | 17 | the notice that we looked at, which was marked |
| 10:21:29 | 18 | as, I believe, Exhibit 21 -- |
| 10:21:29 | 19 | MR. ROGERS: 22. |
| 10:21:32 | 20 | Q.  -- 22, excuse me. |
| 10:21:33 | 21 | A.  And I do not recall the exact dates. |
| 10:21:36 | 22 | Q.  Okay. We'll come back to this. |
| 1:21:45 | 23 | This document is dated what, the |

| | |
|---|---|
| 10:32:57  1 | MR. LEE: I think he said he |
| 10:32:59  2 | doesn't remember the date. |
| 10:33:00  3 | A.    You've already asked this one. |
| 10:33:03  4 | Q.    So, you don't know? |
| 10:33:05  5 | A.    I do not keep track of exact dates. |
| 10:33:10  6 | Q.    The corporation does not know when they |
| 10:33:12  7 | sent someone to the site? |
| 10:33:13  8 | A.    I do not have that information in front |
| 10:33:15  9 | of me. |
| 10:33:16 10 | Q.    The corporation does not know? |
| 10:33:20 11 | MS. POWELL: I think that has |
| 10:33:21 12 | been asked and answered. |
| 10:33:23 13 | MR. LEE: Let's move on. |
| 10:33:25 14 | MS. POWELL: He has answered he |
| 10:33:27 15 | does not remember the exact date. |
| 10:33:28 16 | MR. ROGERS: This is a question |
| 10:33:30 17 | for the corporation and we just want the |
| 10:33:31 18 | corporation's answer. |
| 10:33:32 19 | MR. LEE: The corporation has |
| 10:33:34 20 | already said that he does not remember. |
| 10:33:36 21 | MS. ANDREEN: He doesn't know. |
| 10:33:37 22 | MR. LEE: He said he does not |
| :33:38 23 | remember, is what he said. |

Page 79

| | | |
|---|---|---|
| 10:33:40 | 1 | MR. ROGERS: He said he doesn't |
| 10:33:41 | 2 | know. |
| 10:33:42 | 3 | MR. LEE: Mabry, let's don't |
| 10:33:44 | 4 | play games. Move on. |
| 10:33:46 | 5 | MR. ROGERS: The game is being |
| 10:33:49 | 6 | played by a lawyer. The man has got the |
| 10:33:52 | 7 | document eighteen inches from his left hand at |
| 10:33:54 | 8 | this moment. |
| 10:33:55 | 9 | MR. LEE: You do to. You do to. |
| 10:33:56 | 10 | MR. ROGERS: I don't. |
| 10:33:56 | 11 | MR. LEE: You do. |
| 10:33:57 | 12 | MR. ROGERS: We didn't bring any |
| 10:33:57 | 13 | documents. |
| 10:33:57 | 14 | MR. LEE: They've been produced |
| 10:33:58 | 15 | to you. |
| 10:33:58 | 16 | MS. POWELL: There are documents |
| 10:33:59 | 17 | in there that say when Cullen went to the |
| 10:34:02 | 18 | plant. |
| 10:34:03 | 19 | MR. LEE: There's no mystery. |
| 10:34:05 | 20 | MR. ROGERS: Excuse me. I'm |
| 10:34:06 | 21 | just going to make this one statement. |
| 10:34:08 | 22 | Eighteen inches from his hand, is the |
| 10:34:10 | 23 | document. He had it up on the table, your |

**FREEDOM COURT REPORTING**

Page 120

| | |
|---|---|
| 11:50:32  1 | Q. So, there are two tanks, one done right |
| 11:50:35  2 | before the other. One had a catastrophic |
| 11:50:38  3 | failure and that sheet is missing. |
| 11:50:40  4 | A. Uh-huh. That is correct. |
| 11:50:41  5 | Q. Other tanks that were built, |
| 11:50:48  6 | manufactured, during the month of November of |
| 11:50:54  7 | 2003, are there any other forms missing? |
| 11:50:57  8 | A. We did not check for that. We were |
| 11:50:59  9 | specifically trying to find the tank in |
| 11:51:02 10 | question. |
| 11:51:03 11 | Q. Is this a quality-control issue in your |
| 11:51:07 12 | document retention? |
| 11:51:07 13 | A. We don't know why it's missing. |
| 11:51:10 14 | Q. Are you concerned that it's missing? |
| 11:51:13 15 | A. No. |
| 11:51:13 16 | Q. Would this be in that electronic |
| 11:51:27 17 | database that you were telling me about |
| 11:51:29 18 | earlier, an MRP? |
| 11:51:30 19 | A. No. That is strictly a hand file. |
| 11:51:33 20 | Q. Is there ever any electronic copy or |
| 11:51:37 21 | recording of hydrotesting or -- excuse me, |
| 11:51:40 22 | your form says water test? |
| :51:42 23 | A. No. |

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

FREEDOM COURT REPORTING

Page 241

| | | |
|---|---|---|
| 15:02:04 | 1 | I don't think you can testify about the |
| 15:02:06 | 2 | document itself. |
| 15:02:07 | 3 | Q.    When did Snyder Industries contemplate |
| 15:02:19 | 4 | litigation in this matter? |
| 15:02:21 | 5 | A.    When did they contemplate litigation? |
| 15:02:25 | 6 | Q.    Yes, sir. |
| 15:02:25 | 7 | A.    Uhm, I would say probably before |
| 15:02:31 | 8 | Mr. Cullen Estes went to the site. |
| 15:02:33 | 9 | Q.    And why would you say that, sir? |
| 15:02:35 | 10 | A.    Because when Cullen went to the site, |
| 15:02:37 | 11 | there was already a lot of, you know, noise |
| 15:02:42 | 12 | being made about who is going to pay or who is |
| 15:02:45 | 13 | going to replace or who is going to pay for |
| 15:02:48 | 14 | all of this. |
| 15:02:48 | 15 | Q.    Who was making noise, sir? |
| 15:02:50 | 16 | A.    That would have been conversations with |
| 15:02:53 | 17 | N.A. Water or USFilter, as they were named at |
| 15:02:58 | 18 | that point, and Augusta Fiberglass. |
| 15:03:00 | 19 | Q.    If you were contemplating litigation as |
| 15:03:22 | 20 | early as before Mr. Estes went to the site on |
| 15:03:25 | 21 | September 20th, what efforts did Snyder |
| 15:03:30 | 22 | Industries go to, to preserve data and |
| :03:35 | 23 | documents related to this incident and the |

Page 242

15:03:39  1   manufacture of this tank?
15:03:42  2   A.   Basically, our normal storage methods.
15:03:46  3   Q.   So, you didn't do anything special in
15:03:52  4   anticipation of litigation?
15:03:53  5   A.   No, not that I am aware of.
15:03:56  6   Q.   So, any documents that, based on your
15:03:58  7   normal document retention policy that could
15:04:00  8   have been destroyed, were destroyed?
15:04:03  9   A.   That's probably correct.
15:04:06 10   Q.   Thank you, sir.  Back to Exhibit 35,
15:04:21 11   page 254.
15:04:26 12   A.   Exhibit 35, 25 --
15:04:31 13   Q.   Exhibit 35, and it's the second page of
15:04:33 14   the letter.
15:04:34 15   A.   Okay.  Yes.
15:04:46 16   Q.   The third bullet down, which begins,
15:04:50 17   "There appears to be residual orange glue on
15:04:53 18   the failed glue joint, which confirms that the
15:04:55 19   flange was glued to the pipe stub.  Orange is
15:05:01 20   the color of the CPVC glue that is used in the
15:05:02 21   factory, which indicates that the correct glue
15:05:04 22   was used.  There also appears to be residual
15:05:11 23   purple primer on the failed glue joint, which

FREEDOM COURT REPORTING

Page 243

15:05:15  1   is also the correct color of the CPVC primer
15:05:21  2   used in the factory."
15:05:23  3   A.    That is correct.
15:05:23  4   Q.    Assuming that Mr. Cullen Estes said
15:05:27  5   this, would you disagree with him, with those
15:05:30  6   statements?
15:05:30  7   A.    No, I wouldn't disagree with that.
15:05:32  8   Q.    What did Snyder Industries do, based on
15:05:36  9   this information that the proper glue was
15:05:39 10   used, but the joint failed regardless?
15:05:41 11   A.    Well, there's basically -- once we knew
15:05:47 12   the proper glue was used, without the joint,
15:05:51 13   there was very little we could do further.
15:05:54 14   Q.    Did you investigate who glued the joint
15:05:57 15   together?
15:05:58 16   A.    We really don't keep records of who
15:06:01 17   glues joints, so we had no way to go back to
15:06:04 18   try to visit who glued this joint.
15:06:08 19   Q.    Do your employees keep time sheets?
15:06:11 20   A.    Our hourly employees have a timecard
15:06:16 21   system where they, you know, punch in and
15:06:19 22   punch out.
 :06:20 23   Q.    Would it have been an hourly employee

Page 244

| | |
|---|---|
| 15:06:22 1 | that would have performed this work for Snyder |
| 15:06:24 2 | Industries? |
| 15:06:24 3 | A.    Yes. |
| 15:06:25 4 | Q.    Do they record in any way what purchase |
| 15:06:27 5 | orders or manufacturing runs they were working |
| 15:06:30 6 | on? |
| 15:06:30 7 | A.    No. It's just a time-in and time-out |
| 15:06:33 8 | card. |
| 15:06:33 9 | Q.    Does the operations manager, or anyone |
| 15:06:35 10 | in the similar capacity that would have access |
| 15:06:38 11 | to the manufacturing process, keep records or |
| 15:06:41 12 | daily reports of who is working on specific |
| 15:06:44 13 | purchase orders or projects? |
| 15:06:46 14 | A.    Not that I'm aware of. |
| 15:06:50 15 | Q.    Would you go back to Exhibit 26 and look |
| 15:07:15 16 | at page 98, Bates Number 00098? |
| 15:07:22 17 | A.    Which page? |
| 15:07:23 18 | Q.    Ninety-eight. |
| 15:07:28 19 | A.    Ninety-eight. Okay. |
| 15:07:35 20 | Q.    Before we look at this, did Snyder |
| 15:07:40 21 | Industries continue using this glue after it |
| 15:07:42 22 | had discovered that it had failed? |
| 15:07:46 23 | A.    This was a normal CPVC cement and we |

15:07:54  1  continued using this glue.  We did do a review
15:07:56  2  of the glue procedure and, you know, what was
15:07:59  3  done shortly afterwards, but -- and at that
15:08:05  4  point in time, we found out that we could
15:08:07  5  actually, instead of using a specific glue for
15:08:10  6  CPVC and a specific glue for PVC, we
15:08:16  7  discovered, actually, that there was a CPV --
15:08:19  8  PVC glue that would do everything.  So,
15:08:22  9  instead of having multiple different kinds of
15:08:25  10 glues, we decided we would just consolidate
15:08:28  11 and go with one glue; solvent cement.
15:08:30  12 Q.    You changed your way of doing solvent
15:08:33  13 welding?
15:08:33  14 A.    Yes, solvent -- yes.  We -- basically
15:08:36  15 what happened is, we decided that we could do
15:08:38  16 a reduction in part numbers we had to carry.
15:08:41  17 Q.    So, it saved you money?
15:08:46  18 A.    Yes, I would say it did.  We wouldn't
15:08:48  19 have to carry so many inventory items.
15:08:51  20 Q.    You said that you had done a glue
15:08:55  21 procedures review?
15:08:56  22 A.    Uh-huh.  (Witness nods head.)
15:08:56  23 Q.    Did you do it in writing?  Is there a

| | |
|---|---|
| 15:09:02 1 | report on this? |
| 15:09:02 2 | A. Not a -- not a report of the review. |
| 15:09:05 3 | Basically, what we did is, we looked at the |
| 15:09:08 4 | different kinds of glues that we were carrying |
| 15:09:11 5 | and found out, from one of our vendors, that |
| 15:09:14 6 | there is a glue that does everything. |
| 15:09:18 7 | Q. Who is "we" looked at? |
| 15:09:20 8 | A. Actually, this is something that I |
| 15:09:22 9 | looked at. |
| 15:09:22 10 | Q. So, you investigated the glues? |
| 15:09:24 11 | A. I investigated it myself. |
| 15:09:29 12 | Q. How did you communicate with the |
| 15:09:32 13 | different vendors or whomever you were |
| 15:09:35 14 | communicating with when you were investigating |
| 15:09:39 15 | this? |
| 15:09:39 16 | A. It started out as just a web search to |
| 15:09:42 17 | see what was out there and progressed to a |
| 15:09:44 18 | phone conversation with a vendor. |
| 15:09:45 19 | Q. A vendor or multiple vendors? |
| 15:09:48 20 | A. A particular vendor, which was a |
| 15:09:51 21 | manufacturer of solvent cement. |
| 15:09:52 22 | Q. Do you maintain a file on this research |
| :09:55 23 | that you did? |

FREEDOM COURT REPORTING

Page 247

```
15:09:56  1   A.    No.  It was just a recommendation of
15:09:58  2   purchasing that we could consolidate.
15:10:00  3   Q.    Back to page 98, on Exhibit 26, this is
15:10:07  4   the Inspection and Test Status part of your
15:10:11  5   quality assurance procedure, Section 4.12?
15:10:15  6   A.    Uh-huh.
15:10:15  7   Q.    In here, it states that each individual
15:10:18  8   item has its own unique serial number assigned
15:10:23  9   by bar code scanning equipment.
15:10:25 10   A.    Say it again?  Which one?
15:10:27 11   Q.    The middle of the page, 4.12.4,
15:10:33 12   "Procedures"?
15:10:33 13   A.    Uh-huh.  (Witness nods head.)
15:10:37 14   Q.    Each individual has its own unique
15:10:40 15   serial number automatically assigned by the
15:10:42 16   bar code scanning system.
15:10:44 17   A.    Correct.
15:10:44 18   Q.    Furthermore, at the bottom of that page,
15:10:47 19   under 4.12.6, Records, it states that the bar
15:10:51 20   code scanning databases are stored within the
15:10:55 21   Quality Assurance and Engineering computers
15:10:56 22   for a period of not less than five years.
15:10:59 23   A.    Uh-huh.  (Witness nods head.)
```

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Page 268

| | |
|---|---|
| 15:40:03  1 | that? |
| 15:40:03  2 | A.    Without the pieces, it's kind of |
| 15:40:09  3 | difficult to tell, you know, the texture and |
| 15:40:11  4 | so forth.  Uhm, these photographs are pretty |
| 15:40:17  5 | vague and grainy.  I really don't think I |
| 15:40:21  6 | could make any kind of judgment, especially on |
| 15:40:24  7 | a gloss or a mat-type finish or area. |
| 15:40:29  8 | Q.    You've seen this report before, though, |
| 15:40:40  9 | correct? |
| 15:40:40 10 | A.    Yes, I have. |
| 15:40:41 11 | Q.    All right.  Where is your copy of this |
| 15:40:42 12 | report? |
| 15:40:43 13 | A.    My copy is probably in Lincoln, |
| 15:40:46 14 | Nebraska. |
| 15:40:48 15 |            MS. ANDREEN:  I would like to |
| 15:40:50 16 | request, Counsel, that we have a copy of his |
| 15:40:53 17 | report produced. |
| 15:40:53 18 | Q.    When you were reviewing it, did you make |
| 15:40:57 19 | any comments, markings, anything on it? |
| 15:40:59 20 | A.    No. |
| 15:41:00 21 | Q.    After you reviewed this report, this |
| 15:41:13 22 | failure analysis -- |
| 15:41:14 23 | A.    Furthermore, I would note that my copy, |

Page 351

That's all I've got.

MR. OWEN: That was two questions.

MS. ANDREEN: He didn't answer my first question.

MS. POWELL: Strike the second question and answer.

MR. OWEN: We're good. Thank you.

MS. ANDREEN: That's all I have.

MR. ROGERS: That's all we have subject to a huge number of document requests and failure to produce documents. I want to make this point. There was a statement made once or twice in my presence today that the documents that have not been produced by Snyder are similar to a set of diaries. Those diaries, we are confident don't exist and that was the testimony yesterday. Today, we asked for things that clearly exist and that have not been produced. So, to equate those two, as was done by Mr. Lee, is a typical maneuver by a defendant to act as though the kettle is

**FREEDOM COURT REPORTING**

Page 352

| | | |
|---|---|---|
| 17:33:54 | 1 | not his problem.  I want to make very clear |
| 17:33:57 | 2 | they are not similar incidents whatsoever.  We |
| 17:34:00 | 3 | have asked for documents that should have been |
| 17:34:01 | 4 | in this room before, they clearly exist and |
| 17:34:06 | 5 | were not produced.  And so subject to that, we |
| 17:34:09 | 6 | are through. |
| 17:34:28 | 7 |     MS. POWELL:  The same thing, we |
| 17:34:29 | 8 | will revisit it that was stated before. |
| | 9 |     FURTHER DEPONENT SAITH NOT |
| | 10 | |
| | 11 |     (Whereupon, the deposition was |
| | 12 |     concluded at 5:34 P.M.) |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |

FREEDOM COURT REPORTING

```
 1                    C E R T I F I C A T E
 2
 3   STATE OF ALABAMA:
 4   JEFFERSON COUNTY:
 5
 6        I hereby certify that the above and
 7   foregoing deposition was taken down by me
 8   in stenotype, and the questions and answers
 9   thereto were reduced to typewriting under
10   my supervision, and that the foregoing
11   represents a true and correct transcript of
12   the deposition given by said witness upon
13   said hearing.
14        I further certify that I am neither of
15   counsel nor kin to the parties to the
16   action, nor am I in any way interested in
17   the result of said cause.
18
19
20
21
22
23
```

367 VALLEY AVENUE
(877) 373-3660   BIRMINGHAM, ALABAMA   (205) 397-2397