N.A. WATER SYSTEMS, LLC, ETC.
AUGUSTA FIBERGLASS COATINGS, INC., ET AL.

JERRY WOLFE
August 30, 2006

(Pages 1 to 4)

## Page 1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NO. 2:06-CV-335-MEF

N.A. WATER SYSTEMS, LLC, as successor by merger to USFILTER ENGINEERING & CONSTRUCTION, INC.,
    Plaintiff,
vs.
AUGUSTA FIBERGLASS COATINGS, INC.,
SNYDER INDUSTRIES, INC.,
    Defendants.

DEPOSITION
OF
JERRY WOLFE
August 30, 2006

REPORTED BY: Eleanor S. Pickett
    Certified Shorthand Reporter
    and Notary Public

## Page 2

1     S T I P U L A T I O N
2     IT IS STIPULATED AND AGREED,
3 by and between the parties, through their
4 respective counsel, that the deposition of
5 JERRY WOLFE may be taken before Eleanor S.
6 Pickett, Commissioner, Certified Shorthand
7 Reporter and Notary Public;
8     That the signature to and
9 reading of the deposition by the witness
10 is waived, the deposition to have the same
11 force and effect as if full compliance had
12 been had with all laws and rules of Court
13 relating to the taking of depositions;
14     That it shall not be necessary
15 for any objections to be made by counsel
16 to any questions, except as to form or
17 leading questions, and that counsel for
18 the parties may make objections and assign
19 grounds at the time of trial, or at the
20 time said deposition is offered in
21 evidence, or prior thereto.
22
23

## Page 3

1     A P P E A R A N C E S
2
3 FOR THE PLAINTIFF:
4     Ms. Rhonda Caviedes Andreen
5     Attorney at Law
6     Bradley, Arant, Rose & White, LLP
7     One Federal Place
8     1819 Fifth Avenue North
9     Birmingham, Alabama 35203
10
11 FOR THE DEFENDANT:
12     Mr. Mark W. Lee and
13       Ms. Dorothy A. Powell
14     Attorneys at Law
15     Parsons, Lee & Juliano
16     2801 Highway 280 South
17     Building 3, Suite 300
18     Birmingham, Alabama 35223
19
20
21
22
23

## Page 4

1     A P P E A R A N C E S(Continuing)
2
3 ALSO FOR THE DEFENDANT:
4     Mr. Jack Owen
5     Attorney at Law
6     Ball, Ball, Matthews & Novak, P.A.
7     2000 Interstate Park Drive
8     Suite 204
9     P.O. Drawer 2148
10     Montgomery, Alabama 36102-2148
11
12 OTHERS PRESENT:
13     Mr. Darrell Oltman
14
15
16
17
18     INDEX OF EXAMINATION
19
20     Page:
21 EXAMINATION BY MR. LEE
22 EXAMINATION BY MR. OWEN     292
23

N.A. WATER SYSTEMS, LLC, ETC.
AUGUSTA FIBERGLASS COATINGS, INC., ET AL.

JERRY WOLFE
August 30, 2006

(Pages 5 to 8)

Page 5

INDEX OF EXHIBITS
                                    Page:
Defendant's Exhibit 1
Defendant's Exhibit 2
Defendant's Exhibit 3
Defendant's Exhibit 4
Defendant's Exhibit 5
Defendant's Exhibit 6
Defendant's Exhibit 7
Defendant's Exhibit 8
Defendant's Exhibit 9
Defendant's Exhibit 10
Defendant's Exhibit 11
Defendant's Exhibit 12
Defendant's Exhibit 13
Defendant's Exhibit 14
Defendant's Exhibit 15
Defendant's Exhibit 16
Defendant's Exhibit 17
Defendant's Exhibit 18
Defendant's Exhibit 19
Defendant's Exhibit 20

Page 6

         I, Eleanor S. Pickett, a
Certified Shorthand Reporter of
Birmingham, Alabama, and a Notary Public
for the State of Alabama at Large, acting
as Commissioner, certify that on this
date, as provided by the Federal Rules of
Civil Procedure of the United States
District Court, and the foregoing
stipulation of counsel, there came before
me at the law offices of Parsons, Lee &
Juliano, 2801 Highway 280 South, Building
3, Suite 300, Birmingham, Alabama, on
August 30, 2006, commencing at 9:58 a.m.,
JERRY WOLFE, witness in the above cause,
for oral examination, whereupon the
following proceedings were had:

         THE REPORTER:  Usual
stipulations?
         MR. LEE:  Yes.
         MR. OWEN:  Well, we also
discussed that we would agree to usual
stipulations to all of the depositions of

Page 7

the party deponents, if that's all
right.
         MS. ANDREEN:  That's all
right.  That's fine.
         MR. LEE:  Yes.

         JERRY WOLFE,
having been first duly sworn, was examined
and testified as follows:

EXAMINATION BY MR. LEE:
    Q.   State your name, please.
    A.   Okay.  My name is Jerry Wolfe.
    Q.   What is your home address, Mr. Wolfe?
    A.   143 Lakin Avenue, L-a-k-i-n, Boonsboro, Maryland.
    Q.   What is the city?
    A.   Boonsboro, Maryland.
    Q.   Other than Boonsboro, where is it near?
    A.   It's near Frederick, Maryland.  Does that help?  It's near Washington,

Page 8

D. C.
    Q.   All right.
    A.   It's the western part of the state.
    Q.   All right.  Are you married?
    A.   Yes.
    Q.   What is your wife's name?
    A.   Nancy.
    Q.   Children?
    A.   Yes.
    Q.   How many children?
    A.   Two of mine and one of hers.
    Q.   By whom are you employed, Mr. Wolfe?
    A.   I'm employed by N.A. Water Systems.
    Q.   And how long have you been working for N.A. Water Systems?
    A.   Three years and I'm in my fourth year.  I started in May, at the end of May.
    Q.   And your employment prior to N.A. Water Systems?

Case 2:06-cv-00335-MEF-SRW   Document 18-2   Filed 09/25/2006   Page 3 of 10

N.A. WATER SYSTEMS, LLC, ETC.  
AUGUSTA FIBERGLASS COATINGS, INC., ET AL.

JERRY WOLFE  
August 30, 2006

(Pages 233 to 236)

Page 233

1  Q.  Yes, sir. When was it brought
2  to your attention that this tank was
3  leaking?
4  A.  I believe Rey was contacted by
5  Mr. Chang on Saturday, the 11th, and said
6  that there was a leak at the sulfuric acid
7  tank at a pipe.
8  Q.  When were you notified about
9  it?
10  A.  When I personally knew?
11  Q.  Yes.
12  A.  Gosh, I can't remember if Dave
13  called me at home or not. I don't
14  remember. It might have been Monday. It
15  might have been Saturday night. I really
16  don't know.
17  Q.  Was it before or after the
18  spill?
19  A.  Oh, it was afterwards.
20  Q.  You didn't know --
21  A.  Oh, no, no, no, I'm sorry.
22  You mean the leak, the drip leak?
23  Q.  Yeah, I'm not talking about

Page 234

1  the --
2  A.  No, no, I was thinking of the
3  failure of the thing altogether.
4  Q.  No, I'm not talking about
5  that. I'm talking about the --
6  A.  Rey might have had it in his
7  daily report, and that's probably how I
8  knew about it. Because I think Thomas
9  went to Rey about it, and Rey put it in
10  his daily report.
11  Q.  Was Rey Six on site?
12  A.  Yes.
13  Q.  When this tank started
14  leaking?
15  A.  Well, he was called that it
16  started leaking, yeah.
17  Q.  All right. And did he go to
18  the site as far as you knew?
19  A.  He went to the site Saturday,
20  as far as I know.
21  Q.  All right. Was there any
22  thought given to pumping the acid out of
23  there before trying to fix it?

Page 235

1  A.  Well, I don't think anybody
2  tried to fix it before it failed. No one
3  did try to fix it before it failed.
4  Q.  Well, was there any thought to
5  pumping the acid out before failure?
6  A.  I think Rey might have sent
7  something in his report about getting it
8  pumped out.
9  Q.  Well, would that have been the
10  right thing to do in your opinion?
11  A.  Prior to actually instituting
12  the actual repairs once you had a plan of
13  what you want to do, yeah.
14  Q.  Well, what was the plan?
15  A.  The plan was to see what was
16  leaking, investigate what the leak was. I
17  mean, we had a spun bolt in a caustic tank
18  which was only a drip that had to be -- it
19  was a bolt, and this similarly would be
20  the same thing.
21  Q.  All right. I know they sent a
22  Harbert person down to either check it out
23  or fix it or whatever --

Page 236

1  A.  I think Jim was on site.
2  Q.  Who was it that tried to do
3  this work?
4  A.  There wasn't any work that he
5  did. He got --
6  Q.  Who is "he"?
7  A.  Jim Stephens.
8  Q.  All right. Jim Stephens is
9  the Harbert person that went in there and
10  put the clothes on?
11  A.  And then Stephens went in.
12  And he was going to go in without his PPE.
13  Q.  He what now?
14  A.  Without his personal
15  protective equipment. And Rey caught him
16  and said don't even think about it, put
17  your suit on and get all completely done
18  and I will get the hose out and then you
19  go in. That's standard operating
20  procedure for this kind of thing.
21  Q.  For what reason did he have to
22  have personal protective equipment on?
23  A.  Because that's standard safety

N.A. WATER SYSTEMS, LLC, ETC.
AUGUSTA FIBERGLASS COATINGS, INC., ET AL.

JERRY WOLFE
August 30, 2006

(Pages 241 to 244)

Page 241

1  Q. We had a disconnect on the
2  definition.
3  A. I think so too.
4  Q. All right. Would it be fair
5  to say, then, that there is a possibility,
6  remote or real, that catastrophic failure
7  can occur even at what are beginning small
8  leaks?
9  A. Yes.
10 Q. All right. Now, when N.A.
11 Water Systems -- was this Mr. Stephens,
12 did he go at Rey's direction?
13 A. No, he went on his own.
14 Q. So N.A. did not know he was
15 even going?
16 A. No, Rey was there. I mean, he
17 knew what he was going to do.
18 Q. What was he going to do?
19 A. He wasn't directed.
20 Q. What was he going to do?
21 A. He said I'm going to go in and
22 see where that's leaking from to Rey. And
23 Rey said well, you got to put a suit on.

Page 242

1  He said well, I'm just going to look at
2  it. And Rey said you still have got to
3  put a suit on. So he put the suit on.
4  And Rey got a hose out, which is standard
5  procedure in case you got to wash him
6  down, and then Jim went in. And Jim told
7  me all I did was touch it and it just flew
8  apart.
9  Q. What is the "it"?
10 A. The pipe. He said all I did
11 was touch it when I leaned over to look at
12 it, and it just blew off of there. He
13 said it fell apart. I said did you do
14 anything with it. He said no, said I just
15 went in and looked at it and he said I
16 just touched it, and the whole thing fell
17 off.
18 Q. Now, let me ask you this
19 question. Had you been there, would you
20 have suggested he do that?
21    MS. ANDREEN: Object to the
22 form.
23 Q. Would you suggest that --

Page 243

1  yeah, let me add some meat and potatoes to
2  my question.
3  A. Okay.
4  Q. Had you been there instead of
5  Mr. Rey Six and Jim Stephens was going in
6  there, he had this suit on, would you have
7  suggested that he goes down there without
8  pumping that acid out and start touching
9  the pipe from which it is leaking?
10 A. Me personally?
11 Q. Yeah.
12 A. In all honesty --
13 Q. Yeah.
14 A. -- I probably would have did
15 the same thing Rey did.
16 Q. All right. Now, you would
17 have said go ahead and do what you got to
18 do?
19 A. No. I would have told him to
20 put on his PPE and got a hose out and made
21 sure that, you know, he was going in in a
22 confined, dangerous area and we had
23 protection in place so nothing would

Page 244

1  happen.
2  Q. All right. Would a
3  possibility have been available to N.A.
4  Water Systems before you send a person
5  down there and start touching the pipe to
6  pump that acid out into another container?
7  Is that a possibility?
8  A. In hindsight, yes, I guess
9  that could have been done.
10 Q. Well --
11 A. That's -- but we did not
12 instruct Rey to go in and do that. He
13 decided -- I think Rey actually installed
14 the transmitter and the valve, and so he
15 wanted to go in and see where it was
16 leaking. And he probably assumed -- I
17 think he assumed it was another bolt that
18 had to be tightened up, and that was all
19 there was to it.
20    MS. ANDREEN: Excuse me.
21 Could you read what he just said, that
22 statement back?
23    (Record read.)

Case 2:06-cv-00335-MEF-SRW    Document 18-2    Filed 09/25/2006    Page 5 of 10

N.A. WATER SYSTEMS, LLC, ETC.
AUGUSTA FIBERGLASS COATINGS, INC., ET AL.

JERRY WOLFE
August 30, 2006

(Pages 289 to 292)

Page 289

1 Water Systems personnel?
2    A.    For their tank?
3    Q.    For their tank.
4    A.    This is their guideline, yes.
5    Q.    I didn't ask you if it's their
6 guideline. I just asked you in your
7 opinion are they more knowledgeable or
8 would you expect them to be more
9 knowledgeable --
10   A.    I would expect them to be more
11 knowledgeable.
12   Q.    -- about the testing of their
13 tank? Sir?
14   A.    Yes.
15   Q.    Okay. Well, then, if you can
16 agree with this, then I think I'm going to
17 be done with you.
18         As the corporate representative
19 of N.A. Water Systems, do you agree then
20 that Snyder Industries is more
21 knowledgeable about the tests that are
22 appropriate to its tank than does N.A.
23 Water Systems?

Page 290

1         MS. ANDREEN: Object to the
2 form.
3    A.    Not for the application that
4 this tank was used for.
5    Q.    Who at N.A. Water Systems is
6 more knowledgeable than the Snyder design
7 engineers?
8    A.    Our safety manager, Dave
9 Choate, Dave Parker.
10   Q.    All right. Who else?
11   A.    Those are three that I know of
12 for sure.
13   Q.    The safety man, what is his
14 name?
15   A.    Mike Kellar.
16   Q.    All right. So what you are
17 saying, it is the position of N.A. Water
18 Systems that there are three individuals
19 at N.A. Water Systems who have more
20 knowledge concerning testing criteria for
21 the Snyder tank than the Snyder engineers,
22 and that would be Dave Choate, Dave
23 Parker, and Mike Kellar?

Page 291

1         MS. ANDREEN: Object to the
2 form.
3    A.    I said for this application,
4 the application being sulfuric acid.
5    Q.    All right. I mean, that's
6 your position?
7    A.    That's the position, yes.
8         MR. LEE: Subject to the
9 search for these additional documents that
10 we have made reference to, Rhonda, we are
11 going to adjourn this 30(b)(5) and (6)
12 deposition for our questions. Mr. Owens
13 has some questions. But as far as our
14 part, we call it an adjournment. If it
15 turns out there are no documents, then we
16 will call it to an end.
17        MS. ANDREEN: Yes, it is on
18 the record where we are reserving our
19 rights.
20        MR. LEE: You are reserving
21 your right. You can say this adjournment
22 is a conclusion and we'll say --
23        MS. ANDREEN: I may well say

Page 292

1 it is a conclusion, but we will see. We
2 are reserving our rights.
3         MR. LEE: We are calling it an
4 adjournment with time reserved.
5         MS. ANDREEN: Fair enough.
6 And that time reserved is approximately
7 how much time?
8         MR. LEE: Less than two hours,
9 I think.
10        MS. ANDREEN: To be verified
11 by the court reporter's recording.
12
13 EXAMINATION BY MR. OWEN:
14   Q.    Mr. Wolfe, my name is Jack
15 Owen. I represent Augusta Fiberglass in
16 this lawsuit. And recognize I'm under a
17 time constraint which I agree to, and I
18 will try to get everything I need from you
19 within the time remaining.
20        I wanted to ask you some
21 questions about the process for requesting
22 bids, receiving bids and issuing purchase
23 orders by N.A. Water Systems or USFilter

N.A. WATER SYSTEMS, LLC, ETC.
AUGUSTA FIBERGLASS COATINGS, INC., ET AL.

JERRY WOLFE
August 30, 2006

(Pages 293 to 296)

Page 293

1 and specifically with respect to the
2 Hyundai project.
3     Would that area of inquiry be
4 within the scope of those matters about
5 which you are able to testify on behalf of
6 N.A. Water Systems today?
7     A.   To the extent of my knowledge,
8 yes.
9     Q.   Okay. Now, in reviewing the
10 documents, the name Paul Roth has caught
11 my attention as supervisor of purchasing
12 for USFilter Engineering & Construction.
13 Is that your understanding of Mr. Roth's
14 position at the time of the issuance of
15 the request for bids and the awarding of
16 the tank supply contracts in this case?
17     A.   He might have had someone else
18 over him at that time, but I'm not sure
19 when he left.
20     Q.   Would you say as between
21 yourself and Mr. Roth, he would have been
22 more knowledgeable about the specifics
23 involved in requesting bids, receiving

Page 294

1 bids and issuing purchase orders?
2     A.   In what had to be done, that's
3 correct.
4     Q.   And I understand Mr. Roth is
5 no longer employed by N.A. Water Systems?
6     A.   That's correct.
7     Q.   Do you know where he is
8 employed?
9     A.   I don't personally know where
10 he is, but I'm sure that they know where
11 he is in the Pittsburgh office.
12     Q.   So it's possible that if we
13 needed to locate him, your office might be
14 able to provide some assistance?
15     A.   I would think so.
16     Q.   Okay.
17         MS. ANDREEN: And, Jack, if
18 you will just contact me about that, we'll
19 work through that.
20         MR. OWEN: Yeah. Sure. It
21 may or may not be necessary, depending on
22 how we go today.
23     Q.   I have a small series of

Page 295

1 documents I would like to just discuss
2 with you, if we can. And we'll mark these
3 consecutively as defendant's exhibits in
4 order to try to avoid confusion here and
5 later. I'm going to mark the first one
6 Defendant's Exhibit 14.
7         (Whereupon, Defendant's
8         Exhibit 14 was marked for
9         identification.)
10     Q.   And I'm going to hand that to
11 you now. While you're looking at that, I
12 believe earlier in response to Mr. Lee's
13 questions, you identified what you
14 understood to be the package of materials
15 that went out from USFilter soliciting
16 bids for supplying the tanks for use in
17 the Hyundai project, correct?
18     A.   That's right.
19     Q.   Can you identify for me, then,
20 if you know, what Exhibit 14 is?
21     A.   This is a quotation for the
22 project from Augusta Fiberglass for
23 fiberglass and the high density

Page 296

1 polyethylene tanks, the sulfuric acid --
2 sulfuric acid and the sodium hydroxide.
3     Q.   All right. In your
4 experience, is this typical of responses
5 of tank suppliers to request for bids?
6     A.   As far as I know. Our company
7 had dealt a lot with Augusta.
8     Q.   Okay. And it's correct to say
9 that Augusta Fiberglass was not the only
10 tank supplier that received a request for
11 a quotation, a bid solicitation?
12     A.   I would assume that he went
13 for others also, "he" being Paul Roth.
14     Q.   All right. And just so we are
15 clear on what Exhibit 14 is, to get some
16 specifics with it, it's dated July the
17 8th, 2003?
18     A.   That's right.
19     Q.   It's addressed to Paul J. Roth
20 at USFilter in Moon Township, Pennsylvania
21 and the subject is quotation for Project
22 Number 7041-01-01. And that would be
23 USFilter's project number for the Hyundai

N.A. WATER SYSTEMS, LLC, ETC.  
AUGUSTA FIBERGLASS COATINGS, INC., ET AL.

JERRY WOLFE  
August 30, 2006

(Pages 297 to 300)

Page 297

1  project, correct?
2      A.   That is correct.
3      Q.   And then below that in the
4  subject reference is AFC reference number
5  7790(307-036)GM. And would it be your
6  understanding that would be how Augusta
7  Fiberglass referred to its quote for this
8  project?
9      A.   Yes.
10     Q.   In the area where it says
11 description of quote there on the first
12 page, there is a statement that says,
13 "AFC's quotation is conditioned upon the
14 attached commercial terms." Is that
15 something that you have familiarity with
16 seeing from time to time on quotes from
17 suppliers?
18     A.   Yes, that comes in.
19     Q.   All right. And if we look at
20 the last page of this document, which, by
21 the way, bears production numbers from
22 N.A. Water Systems N001 24 through 29.
23 And on the last page of this Exhibit 14 on

Page 298

1  that page 29, there is a document that's
2  headed Augusta Fiberglass Terms and
3  Conditions, correct?
4      A.   That's true.
5      Q.   This particular quote is for
6  four separate tanks for the Hyundai
7  project; is that correct?
8      A.   Yes.
9      Q.   All right. Just to be clear,
10 I know within industry, there are item
11 numbers that are specific to USFilter's
12 plans and specifications that identify the
13 specific tanks. And, in this case, this
14 quote was for items number 716, 712, 711,
15 and 713?
16     A.   Through 716.
17     Q.   I thought the first one was
18 716?
19     A.   It may be, yes, 716, that's
20 right.
21     Q.   And the sulfuric tank was
22 number 713?
23     A.   That's correct.

Page 299

1      Q.   Okay. Now, this is dated
2  July 8th, 2003. Do you know of any event
3  that occurred within USFilter, and I use
4  that term interchangeably with N.A. Water
5  Systems at this point, to change the
6  request for bids on these tank items?
7      A.   Not that I'm aware of.
8      Q.   Okay. Is it possible that
9  there are persons within the N.A. Water
10 Systems organization that might be aware
11 whether or not there were changes in the
12 bid solicitations?
13     A.   Yeah, somebody over my level
14 probably would.
15     Q.   Did Dave Parker have a role in
16 the bid solicitation process?
17     A.   As project engineer, he did
18 the technical specification.
19          (Whereupon, Defendant's
20          Exhibit 15 was marked for
21          identification.)
22     Q.   Okay. I'll show you a second
23 document we have now had marked as

Page 300

1  Defendant's Exhibit 15 which for the
2  record is an Augusta Fiberglass letterhead
3  quote dated July 29th, 2003 addressed to
4  Paul J. Roth, the subject of which is
5  identified as quotation project number
6  7041-01-01 revision number one with the
7  same AFC reference.
8      A.   (Reviewing document.)
9      Q.   While you look at that, just
10 let me ask you, is this a document you
11 have not seen before today?
12     A.   I think in review of some of
13 this and everything that's gone on, I did
14 generally see these, yes.
15     Q.   Okay. Do you know why there
16 were -- and, again, just looking through
17 this, this is an Augusta Fiberglass quote
18 for the same four tanks that were the
19 subject of the quote of July the 8th,
20 2003, is it not? I see numbers --
21     A.   Yeah.
22     Q.   -- 716, 711, 712 and 713?
23     A.   That's correct.

Page 301

1   Q.   And without reviewing it
2   because of time constraints, do you know
3   what the differences are between the two
4   quotes?
5       A.   Actually, I don't. I would
6   have to review.
7       Q.   Fine. That's fine. Now, when
8   USFilter concludes that a particular quote
9   from a tank supplier is the one it wishes
10  to accept, how does it go about accepting?
11      A.   To the best of my knowledge,
12  Paul Roth issues the purchase order and --
13  with our terms and conditions and
14  everything else that's with it. I think
15  that goes -- probably goes with the
16  request for quote too.
17      Q.   Okay. But the process is,
18  there is basically three steps involved in
19  any quote bidding and acceptance process?
20      A.   Yeah.
21      Q.   The buyer, in this case,
22  USFilter, sends out the solicitation for
23  quotes, the bid package?

Page 302

1       A.   That's right.
2       Q.   Vendors submit quotes such as
3   we have seen here with Augusta Fiberglass?
4       A.   Uh-huh.
5       Q.   And then the buyer decides
6   which quote it wishes to accept, and the
7   way it acknowledges that is to issue a
8   purchase order?
9          MS. ANDREEN: Object to the
10  form.
11      Q.   Is that the process that's
12  typically used?
13         MS. ANDREEN: Object to the
14  form.
15      A.   I'm not totally aware of all
16  of the process that they did in their
17  shop, their shop being the purchasing
18  department. So I'm not sure exactly
19  everything that went out with them.
20      Q.   Let me ask you this, then,
21  before we go any further. In light of Mr.
22  Roth's departure from the company, who is
23  currently in the employ of N.A. Water

Page 303

1   Systems who has the most knowledge with
2   respect to the bid solicitation, bid
3   award, purchase order issue process
4   related to the Hyundai project?
5       A.   That would be difficult. All
6   of those people are no longer with us.
7   I'm not -- Roth would probably be the best
8   to answer that. I really --
9       Q.   I assumed as much. But in his
10  absence if we needed someone to speak for
11  the company, who would it be?
12      A.   Well, we have another
13  purchaser. But the problem with that
14  being would be that he's pretty new. And
15  I'm sure since the time Hyundai, it's been
16  a few years, there's been some changes in
17  procedures.
18      Q.   All right. And who is the new
19  purchaser?
20      A.   I can't remember his name. I
21  don't remember his name. I could pull it
22  up.
23      Q.   That's okay.

Page 304

1       A.   I can provide it, though.
2       Q.   Am I then to conclude from
3   what you have told us that in light of Mr.
4   Roth's departure from the company, there
5   is no one more knowledgeable than yourself
6   with respect to the bid purchase award
7   process?
8       A.   Joe Mracna heads that
9   division, he should know.
10      Q.   Joe, what is his last name?
11      A.   Mracna, M-r-a-c-n-a.
12      Q.   Was he with USFilter in July
13  of 2003?
14      A.   Yes. He has been there all
15  along.
16      Q.   He's the head of the
17  purchasing department?
18      A.   He's the head of the project
19  services group, that includes purchasing.
20  He has a lot more than that.
21      Q.   Would he have been Mr. Roth's
22  superior?
23      A.   Yes, immediate superior. And

Page 305

1  at that time there was another person,
2  like I say, that was in that slot between
3  the two, but I'm not sure if he was there
4  then or not.
5         (Whereupon, Defendant's
6         Exhibit 16 was marked for
7         identification.)
8     Q.  Okay. That's fine. Let me
9  show you now what I've marked as
10 Defendant's Exhibit 16 for your deposition
11 and ask you to tell me if you can identify
12 what that is.
13    A.  Okay. This is purchase order
14 7041-01-009. It is to Augusta Fiberglass.
15 And it is for the -- it is for the
16 USFilter specification purchase of what is
17 in the specification 012 and all documents
18 related to the request for quote. It says
19 RFQ.
20    Q.  Right. You are just reading
21 off the front of the -- it's the purchase
22 order?
23    A.  Yeah, it's a purchase order.

Page 306

1     Q.  All right. And this one is
2  dated August the 21st of '03 and the
3  buyer's name out beside the date says
4  Roth, P. And that would be Paul Roth?
5     A.  That would be Paul.
6     Q.  All right. And this language
7  that's printed on the front of the
8  purchase order, that's put on there at
9  USFilter's direction?
10    A.  Yes.
11    Q.  All right. And you were
12 reading part of that, it looks like --
13    A.  Do you want me to finish that?
14    Q.  Just that one sentence.
15    A.  "This order is in accordance
16 with USFilter's specification 7041-01-012
17 and all documents included in our RFQ and
18 Augusta Fiberglass proposal number
19 7790(307-036)GM."
20    Q.  Okay. Now, those two strings
21 of numbers we identified earlier as being
22 the project reference number for USFilter
23 and then Augusta Fiberglass' reference

Page 307

1  number on its bid, correct?
2     A.  Yes.
3     Q.  And you can look at 14 and 15
4  if you'd like.
5     A.  Yeah, it is.
6     Q.  Okay. And then on a second
7  page of this document -- it's a two-page
8  document, correct, Exhibit 16?
9     A.  That's correct.
10    Q.  And the second page is the
11 page that specifies what is purchased by
12 this document, correct?
13    A.  That's correct.
14    Q.  And down at the bottom it says
15 purchasing authorized signature, and there
16 is a signature that looks like it begins
17 with a P and then dated --
18    A.  8/21.
19    Q.  Is that Paul Roth's signature?
20    A.  It appears to be. Yeah, it's
21 typed in below it.
22    Q.  All right. In your
23 understanding, was Mr. Roth then the

Page 308

1  person authorized on behalf of USFilter to
2  issue the purchase order to purchase these
3  items from Augusta Fiberglass?
4     A.  Yes.
5     Q.  I guess that's why it says
6  authorized signature down there?
7     A.  Yes.
8     Q.  Okay. And in this particular
9  instance, the August 21st, 2003 purchase
10 order is for two tanks, the treated
11 affluent tank and then the ferric sulfide
12 tank, correct?
13    A.  That's right. These are
14 fiberglass tanks.
15    Q.  Okay. So of the four tanks
16 that Augusta Fiberglass bid on, this is a
17 purchase order for two of those four?
18    A.  That's correct.
19    Q.  All right.
20        (Whereupon, Defendant's
21        Exhibit 17 was marked for
22        identification.)
23    Q.  I'm going to show you a

Page 309

1  document that we'll mark Defendant's
2  Exhibit Number 17, and I will ask you to
3  identify that one for us as well.
4     A.   Okay. This is another
5  purchase order to Augusta Fiberglass
6  7041-01-013 and it is for -- the
7  specification 7041-01-008 and all
8  documents included in RFQ in Augusta
9  Fiberglass proposal number
10 7790(307-036)GM.
11    Q.   Okay. The string of numbers
12 for the Augusta Fiberglass proposal is the
13 same as on the other purchase order?
14    A.   By string of numbers --
15    Q.   The 7790 --
16    A.   Yes, that's correct.
17    Q.   Now, there is a little bit of
18 difference in the USFilter specification
19 numbers. They begin the same but they end
20 differently. On Exhibit 16 it says -- it
21 ends -012 and on this one it ends -008.
22 Do you know what that difference is?
23    A.   Specifications are different.

Page 310

1     Q.   And what types of
2  specifications would be different?
3     A.   One is for fiberglass tanks
4  and the other is for the HDPE tanks.
5     Q.   Okay. So if we look at the
6  second page of this purchase order, we see
7  what was purchased from Augusta Fiberglass
8  by USFilter by way of this purchase order,
9  and those are sodium hydroxide tank and a
10 sulfuric acid tank?
11    A.   That's correct.
12    Q.   And these are different in
13 makeup from the tanks that were subject to
14 the earlier purchase orders?
15    A.   That's correct.
16    Q.   The earlier ones on 16 were
17 fiberglass and these are what you call
18 HD --
19    A.   PE.
20    Q.   And what does that stand for?
21    A.   High density polyethylene.
22    Q.   Okay. And in this instance,
23 this is the purchase order for the

Page 311

1  sulfuric acid tank that is the subject of
2  this lawsuit?
3     A.   That's correct.
4     Q.   And it's identified on the
5  second page there as item number two tag
6  number T-713?
7     A.   Uh-huh.
8     Q.   Okay. And, again, at the
9  bottom, this one is signed by Mr. Roth as
10 the authorized signature of the purchaser
11 USFilter and this instance also signed by
12 the seller's acceptance signature, looks
13 like Gerald Meggs?
14    A.   Yes.
15    Q.   Do you know Mr. Meggs?
16    A.   Yes. He is with Augusta.
17    Q.   Okay. And that's just an
18 agent for Augusta Fiberglass, isn't it?
19    A.   I believe, yeah.
20    Q.   Do you know of any other
21 documents besides the bid solicitation
22 package, Augusta Fiberglass' quote and
23 these purchase orders that make up the

Page 312

1  contract between Augusta Fiberglass and
2  USFilter to supply the sulfuric acid tank?
3     A.   The specification package
4  including the technical specification.
5     Q.   Right, the large package
6  document you identified earlier.
7     A.   Right. Yes, as far as I know,
8  that's it.
9     Q.   Okay. Thanks. I will just
10 show you a few more. This I'll mark as
11 Defendant's Exhibit Number 18 and I'll ask
12 you to look at that and tell me what this
13 is, please, sir.
14            (Whereupon, Defendant's
15            Exhibit 18 was marked for
16            identification.)
17    A.   This is another copy of
18 7041-01-13 purchase order from Paul Roth
19 dated August 25, 2003.
20    Q.   All right.
21    A.   This is the unsigned copy.
22 Okay. And attached -- this is unsigned
23 copy of the one I saw before. And there