# FREEDOM COURT REPORTING

### Page 1

```
 1      IN THE U. S. DISTRICT COURT
 2    FOR THE MIDDLE DISTRICT OF ALABAMA
 3           NORTHERN DIVISION
 4
 5   CASE NUMBER: 2:06-CV-325-MEF
 6   N.A. WATER SYSTEMS, L.L.C., as successor
 7   by merger to USFILTER ENGINEERING &
 8   CONSTRUCTION, INC.
 9         Plaintiff,
10      Vs.
11   AUGUSTA FIBERGLASS COATINGS, INC.,
12   SYNDER INDUSTRIES, INC.,
13         Defendants.
14
15      DEPOSITION OF DARRELL ALAN OLTMAN
16
17       STIPULATIONS
18      IT IS STIPULATED AND AGREED by and
19   between the parties through their respective
20   counsel, that the deposition of DARRELL ALAN
21   OLTMAN may be taken before MICKEY TURNER,
22   Commissioner and Notary Public at the law
23   offices of Bradley, Arant, Rose & White, One
```

### Page 2

```
 1   Federal Place, 1819 Fifth Avenue North,
 2   Birmingham, Alabama, on the 31st day of
 3   August, 2006.
 4      IT IS FURTHER STIPULATED AND AGREED
 5   that the signature to and the reading of the
 6   deposition by the witness is waived, the
 7   deposition to have the same force and effect
 8   as if full compliance had been had with all
 9   laws and rules of Court relating to the taking
10   of depositions.
11      IT IS FURTHER STIPULATED AND AGREED
12   that it shall not be necessary for any
13   objections to be made by counsel to any
14   questions except as to form or leading
15   questions, and that counsel for the parties
16   may make objections and assign grounds at the
17   time of the trial, or at the time said
18   deposition is offered in evidence, or prior
19   thereto.
20      IT IS FURTHER STIPULATED AND AGREED
21   that the notice of filing of the deposition by
22   the Commissioner is waived.
23
```

### Page 3

```
 1            INDEX
 2   EXAMINATION BY:        PAGE NUMBER:
 3   Ms. Andreen          7, 350
 4   Mr. Owen             296
 5
 6   PLAINTIFF'S EXHIBITS:
 7   21 - Inspection checklist
 8        For Industrial &
 9        Skid tanks       40
10   22 - Amended Notice of
11        Depo 39(b)(5)&(6) rep  44
12   23 - Handwritten note    61
13   24 - Fax w/bill of lading
14        & shipping list    85
15   25 - Purchase Order    93
16   26 - Snyder Quality
17        Assurance Manual   106
18   27 - Bills of material   123
19   28 - Fabrication drawing  143
20   29 - Vertical storage tank
21        Drawing            144
22   30 - E-mail w/Equip. Tech.
23        Specification     159
```

### Page 4

```
 1   31 - Picture of tank label  179
 2   32 - Drawing              185
 3   33 - Placard info.        186
 4   34 - Fax w/letter 10-20-04  202
 5   35 - Letter 9-23-04       227
 6   36 - Letter 2-2-05
 7        W/backcharges        250
 8   37 - Letter 10-20-04      279
 9   38 - Letter 10-26-04      293
10   39 - Letter 9-26-04
11        W/drawing            289
12
13   DEFENDANT'S EXHIBITS:
14   40 - Synder invoice       312
15   41 - Letter 2-21-05       336
16   42 - Letter 9-30-04       337
17   43 - Letter 9-29-04       330
18   44 - Drawing of vertical
19        Storage tank         347
20
21
22
23
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 5

1  IN THE CIRCUIT COURT OF
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3  NORTHERN DIVISION
4
5  CASE NUMBER: 2:06-CV-325-MEF
6  N.A. WATER SYSTEMS, L.L.C, as successor
7  by merger to USFILTER ENGINEERING &
8  CONSTRUCTION, INC.
9    Plaintiff,
10   Vs.
11 AUGUSTA FIBERGLASS COATINGS, INC.,
12 SYNDER INDUSTRIES, INC.,
13   Defendants.
14 BEFORE:
15   MICKEY TURNER, Commissioner.
16 APPEARANCES:
17   BRADLEY, ARANT, ROSE & WHITE, L.L.P, by
18 Ms. Rhonda Caviedes Andreen and Mr. E. Mabry
19 Rogers, One Federal Place, 1819 Fifth Avenue
20 North, Birmingham, Alabama 35203, appearing on
21 behalf of the Plaintiff - N.A. Water Systems,
22 L.L.C.
23   BALL, BALL, MATTHEWS & NOVAK, P.A, by

Page 6

1  Mr. Jack Owen, 2000 Interstate Park Drive,
2  Suite 204, Montgomery, Alabama 36109,
3  appearing on behalf of the Defendant - Augusta
4  Fiberglass Coatings, Inc.
5    PARSONS, LEE & JULIANO, P.C, by Mr.
6  Marcus W. Lee and Ms. Dorothy A. Powell, 300
7  Protective Center, 2801 Highway 280 South,
8  Birmingham, Alabama 35223, appearing on behalf
9  of the Defendant - Snyder Industries, Inc.
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 7

1  I, MICKEY TURNER, a Court Reporter of
2  Birmingham, Alabama, acting as Commissioner,
3  certify that on this date as provided by the
4  Federal Rules of Civil Procedure and the
5  foregoing stipulation of counsel, there came
6  before me at the offices of Bradley, Arant,
7  Rose & White, One Federal Place, 1819 Fifth
8  Avenue North, Birmingham, Alabama, beginning
9  at 8:30 a.m., DARRELL ALAN OLTMAN, witness in
10 the above cause, for oral examination,
11 whereupon the following proceedings were had:
12
13   DARRELL ALAN OLTMAN,
14 having been duly sworn, was examined and
15 testified as follows:
16   Court Reporter: Usual stipulations?
17
09:06:35 18 EXAMINATION BY MS. ANDREEN:
09:06:35 19 Q. Good morning.
09:06:35 20 A. Good morning.
09:06:37 21 Q. We met yesterday. I'm Rhonda Andreen
09:06:37 22 and I represent North American Water Systems
09:06:37 23 in this litigation.

Page 8

09:06:37 1    Could you please state your full name
09:06:37 2  for the record?
09:06:55 3  A. Darrell Alan Oltman.
09:06:55 4  Q. Just a few little niceties as we get
09:06:55 5  going so you'll know where I'm going and what
09:06:55 6  you can do, which is pretty much anything.
09:07:02 7  If you need a break, let me know you need a
09:07:02 8  break, and we'll be happy to. One thing that
09:07:04 9  will help out Madam Court Reporter, is please
09:07:04 10 answer in whole words and complete sentences.
09:07:04 11 She can't get down uh-huhs and huh-uhs or
09:07:18 12 shoulder shrugs or head nods.
09:07:21 13 A. Right.
09:07:21 14 Q. That would be helpful.
09:07:23 15   I'm going to be asking you some
09:07:25 16 questions, and I'm going to try to articulate
09:07:29 17 them so that they make sense, but I don't
09:07:31 18 always do that. So, if I ask you a question
09:07:34 19 and you don't understand it, let me know you
09:07:37 20 don't understand it. Because if you answer, I
09:07:40 21 will assume you understood my question.
09:07:42 22 A. Okay.
09:07:42 23 Q. Is that agreeable?

2 (Pages 5 to 8)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 9

```
09:07:46  1    A.  That is agreeable.
09:07:48  2    Q.  Thank you.  Could you tell us your
09:07:51  3  current home?
09:07:52  4    A.  4800 South 71st Street, Lincoln
09:07:59  5  Nebraska, 68516.
09:08:03  6    Q.  Have you always lived in Lincoln?
09:08:05  7    A.  I have lived in Lincoln since I went to
09:08:08  8  college at the University of Nebraska.
09:08:11  9    Q.  And what year was that?
09:08:12 10    A.  I started in 1984 and ended in January
09:08:15 11  of 1989.
09:08:16 12    Q.  So, where did you live before you went
09:08:20 13  to Lincoln for school?
09:08:22 14    A.  Well, before I went to school, I lived
09:08:25 15  in Friend, Nebraska, or actually on a farm,
09:08:34 16  south of Friend, Nebraska.
09:08:37 17    Q.  And that's where you were reared and --
09:08:39 18    A.  Correct.
09:08:39 19    Q.  You are Nebraska born and bred?
09:08:43 20    A.  Right, born and bred.
09:08:44 21    Q.  All right.  Who is your current
09:08:47 22  employer?
09:08:47 23    A.  Snyder Industries, Inc.
```

Page 10

```
09:08:51  1    Q.  And how long have you been employed
09:08:53  2  there?
09:08:53  3    A.  Since January 2, 1989.
09:08:55  4    Q.  That would have been right after you
09:08:58  5  completed your degree from college?
09:09:06  6    A.  Correct.
09:09:06  7    Q.  And what is the address of Snyder
09:09:08  8  Industries, Inc.?
09:09:08  9    A.  4700 Fremont Street, Lincoln, Nebraska
09:09:18 10  68504.
09:09:20 11    Q.  You said you have been employed there
09:09:24 12  ever since?
09:09:24 13    A.  Correct.
09:09:25 14    Q.  And when you started work at Snyder, in
09:09:27 15  what capacity was that?  What was your job
09:09:30 16  title?
09:09:30 17    A.  My job title was systems engineer.
09:09:37 18    Q.  Has that ever changed?
09:09:38 19    A.  It has changed to design engineer for
09:09:44 20  the general purpose of change.  Over the
09:09:47 21  years, I've taken on new responsibilities.
09:09:49 22    Q.  What type of new responsibilities have
09:09:53 23  you taken on?
```

Page 11

```
09:09:54  1    A.  I was instrumental in developing a
09:09:58  2  significant portion of our products when the
09:10:03  3  -- when I started with the company, the
09:10:05  4  company was about five million dollars in
09:10:08  5  sales.  Today it's approximately sixty million
09:10:11  6  dollars plus.  I developed a lot of the
09:10:15  7  industrial products that we sell.  I helped to
09:10:19  8  develop a lot of the IBC products that we
09:10:21  9  sell, the whole -- you know, that's an entire
09:10:24 10  product division, as well as a lot of
09:10:29 11  agricultural products and just a variety of
09:10:33 12  custom products over the years.  Also, I
09:10:36 13  developed a dry products line during that
09:10:43 14  period of time.  Beyond that, it's quite a bit
09:10:48 15  of other items from equipment to products.
09:10:50 16    Q.  That's quite an impressive list there
09:10:59 17  for the last -- you've worked there, fifteen,
09:11:03 18  sixteen years now?
09:11:04 19    A.  Plus.
09:11:05 20    Q.  Okay.  Are you working on a team of
09:11:08 21  development or are you the lead developer?
09:11:10 22    A.  No.  The way we -- the way the Snyder
09:11:14 23  Industries separates its duties, is each
```

Page 12

```
09:11:16  1  engineer is responsible for a general area
09:11:20  2  and, then, individual products are assigned to
09:11:26  3  that engineer to complete.
09:11:27  4    Q.  Do you hold any patents?
09:11:34  5    A.  I have been in on a couple of different
09:11:36  6  patents as a named person, but do not hold any
09:11:39  7  specifically myself.
09:11:40  8    Q.  What type of products would those
09:11:46  9  patents have been related to?
09:11:48 10    A.  We applied for a closure patent, which
09:11:52 11  we eventually didn't pursue to completion.  It
09:11:58 12  was a general -- it was a general closure for
09:12:00 13  multiple applications of pumps and closing up
09:12:07 14  tops of tanks, was also instrumental with some
09:12:15 15  of the other patents, but not necessarily
09:12:17 16  named on them.
09:12:17 17    Q.  And what type of patents would those
09:12:18 18  have been?
09:12:20 19    A.  IBCs, intermediate bulk containers.  We
09:12:26 20  developed the Ultratainer.  We also developed
09:12:30 21  the double wall tanks.  We also developed the
09:12:34 22  flexible connection joint, Flexmaster.  There
09:12:37 23  has been many.
```

3 (Pages 9 to 12)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 309

16:44:12  1  Q.  25. Okay. Would it be accurate, then,
16:44:15  2  if we were to identify the two primary
16:44:18  3  documents that you have described for us as
16:44:20  4  basically being the two components that
16:44:23  5  represent the agreement --
16:44:25  6  A.  Uh-huh.
16:44:25  7  Q.  -- for Snyder to manufacture and provide
16:44:28  8  and for Augusta to buy this sulfuric acid
16:44:33  9  tank, we have Augusta's purchase order dated
16:44:38 10  --
16:44:39 11  A.  Exhibit 25, yes.
16:44:40 12  Q.  -- dated what?
16:44:41 13  A.  It's dated -- let's see here -- it
16:44:45 14  appears to be dated September 16, 2003.
16:44:50 15  Q.  Okay. And, then, there is a final
16:44:52 16  sign-off shop drawing that would be internal
16:44:54 17  to Snyder that would represent the acceptance
16:44:58 18  of that purchase order and agreement to
16:45:01 19  provide it?
16:45:01 20  A.  Correct.
16:45:01 21  Q.  Is that Plaintiff's Exhibit 29, the
16:45:03 22  portion we have of that, or is it something
16:45:05 23  else?

Page 310

16:45:05  1  A.  Yes, that is. And, basically, the
16:45:11  2  acceptance of this is, once this drawing is
16:45:13  3  sent back to Augusta and they say, "Yes, this
16:45:19  4  is what we want and it matches our P.O.,"
16:45:22  5  because sometimes we will make changes on
16:45:25  6  these drawings and they'll have to adjust the
16:45:27  7  P.O. slightly, once that is agreed to, we have
16:45:30  8  a legitimate agreement or consider it a
16:45:33  9  legitimate agreement.
16:45:34 10  Q.  Okay. And what you have described for
16:45:49 11  us is this process, this interchange, between
16:45:52 12  Augusta Fiberglass and Snyder Industries, the
16:45:55 13  custom or practice that has developed between
16:45:58 14  these two companies as a result of a history
16:46:01 15  of business dealings in this type of business
16:46:04 16  venture?
16:46:04 17  A.  Yes.
16:46:04 18  Q.  Now, within Snyder Industries, and I'm
16:46:14 19  talking with respect to the front end of the
16:46:16 20  transaction, the preliminary information, the
16:46:20 21  purchase order, the drawings, and fillings --
16:46:24 22  A.  Okay.
16:46:24 23  Q.  -- who with Snyder is most directly or

Page 311

16:46:30  1  was most directly involved with these elements
16:46:32  2  of the business relationship?
16:46:34  3  A.  At the time of the incident?
16:46:36  4  Q.  Yes, back in the fall of '03?
16:46:39  5  A.  I would say it would be a combination of
16:46:42  6  Jason Harrington and Dana Janssen.
16:46:48  7  Q.  And I don't know that Mr. Harrington's
16:46:51  8  name has surfaced earlier. What's his
16:46:54  9  position?
16:46:54 10  A.  I believe he was the sales
16:46:56 11  representative for that area of the country.
16:47:00 12  It would have been Mr. Harrington or
16:47:02 13  Mr. Lenhoff, Jason Lenhoff.
16:47:06 14  Q.  Or Dana Janssen, who is a customer --
16:47:14 15  A.  Dana Janssen is customer service manager
16:47:17 16  and has extensive relations with all of our
16:47:20 17  customers.
16:47:20 18  Q.  Okay. And on the other side of this
16:47:23 19  transaction, who for AFC would be the one most
16:47:29 20  directly involved or was the one most directly
16:47:32 21  involved?
16:47:32 22  A.  I would say it would have been Craig
16:47:35 23  Winningham.

Page 312

16:47:35  1       (Whereupon, Defendant's Exhibit 40
16:47:35  2        was marked for identification and
16:47:35  3        same is attached hereto.)
16:47:54  4
16:47:54  5  Q.  I have a document I would like to mark
16:47:57  6  as Defendant's Exhibit Number 40, which bears
16:48:03  7  -- those are Snyder's production numbers,
16:48:07  8  aren't they, Dorothy?
16:48:07  9       MS. POWELL: I'm sorry?
16:48:09 10       MR. OWEN: Those are Snyder's
16:48:11 11  production numbers?
16:48:11 12       MS. POWELL: They are.
16:48:12 13  Q.  This one bears Snyder Production Numbers
16:48:14 14  112 and 113, which I'll identify as an invoice
16:48:20 15  dated -- the invoice is dated November 29,
16:48:22 16  2003. I will show you that and just ask you a
16:48:25 17  couple of questions about that.
16:48:27 18  A.  Okay.
16:48:49 19  Q.  Now, we talked about the two documents
16:48:51 20  that basically signal the agreement to
16:48:53 21  purchase and to provide the tank in question.
16:48:56 22  A.  Uh-huh. (Witness nods head.)
16:48:57 23  Q.  And, then, of course, Snyder Industries

78 (Pages 309 to 312)

FREEDOM COURT REPORTING

Page 313

```
16:49:00  1   expected to be paid for what they did,
16:49:02  2   correct?
16:49:02  3   A.   Correct.
16:49:02  4   Q.   And can you tell me what relation
16:49:05  5   Defendant's Exhibit 40 has to that process?
16:49:07  6   A.   This would be the invoice for the
16:49:09  7   product that was made on this particular
16:49:12  8   order. And this invoice would have been sent
16:49:15  9   to CORE-B, at which time they would have been
16:49:21 10   obliged to pay the net invoice as shown on the
16:49:25 11   document over some time period.
16:49:27 12   Q.   Okay. And just to identify a few items
16:49:30 13   on the invoice itself, there is a date for
16:49:34 14   that invoice, which is November 29, 2003?
16:49:37 15   A.   Uh-huh. (Witness nods head.)
16:49:37 16   Q.   That would be the date that this
16:49:39 17   particular document was prepared by Snyder?
16:49:41 18   A.   Right.
16:49:41 19   Q.   Now, the order number, to what does that
16:49:45 20   relate?
16:49:45 21   A.   The order number would have been the
16:49:47 22   internal order number within the company, the
16:49:50 23   sales order.
```

Page 314

```
16:49:51  1   Q.   All right. To manufacture and supply
16:49:53  2   this sulfuric acid tank with this
16:49:55  3   configuration?
16:49:56  4   A.   Yes.
16:49:56  5   Q.   Okay. And what does the order date of
16:49:59  6   November 3, 2003 reference?
16:50:01  7   A.   That would be the date the order was
16:50:04  8   entered into the system.
16:50:05  9   Q.   Okay. And that would follow the
16:50:07 10   exchange that led to the final approval of the
16:50:12 11   shop drawings that we talked about?
16:50:13 12   A.   Usually, the order date would or the
16:50:16 13   order would be entered after those final shop
16:50:19 14   drawings are agreed upon.
16:50:21 15   Q.   Okay. Fine. And who is sales person
16:50:26 16   0900?
16:50:27 17   A.   I'm not sure at this moment.
16:50:29 18   Q.   Okay. I assume that all of your sales
16:50:31 19   staff have a number that keys them to your
16:50:34 20   computer that gives them credit for having
16:50:37 21   made the sales, correct?
16:50:38 22   A.   Exactly.
16:50:38 23   Q.   And Customer Number 054128 has to be
```

Page 315

```
16:50:45  1   Augusta Fiberglass?
16:50:46  2   A.   That would be correct.
16:50:47  3   Q.   Okay.
16:50:47  4        MR. ROGERS: Excuse me, is that
16:50:48  5   CORE-B or is it all of those entities, do you
16:50:49  6   know?
16:50:50  7        MR. OWEN: You missed all of
16:50:52  8   that. It's the same person.
16:50:55  9        MR. ROGERS: So, they all have
16:50:56 10   the same number?
16:50:57 11        MR. OWEN: Well, let me ask.
16:50:57 12   That's a good question.
16:50:59 13   Q.   Do CORE-B and Augusta have the same
16:51:04 14   customer number?
16:51:05 15   A.   Yes.
16:51:06 16        MR. ROGERS: I knew he had
16:51:08 17   already told the other. I just didn't know if
16:51:10 18   the same number was the same.
16:51:12 19        MR. OWEN: You're thinking all
16:51:13 20   the time.
16:51:14 21   Q.   In the "sold to" section of the invoice,
16:51:14 22   we're referencing CORE-B again, so with
16:51:14 23   respect to the initial purchase of the tank,
```

Page 316

```
16:51:17  1   CORE-B or AFC, Augusta Fiberglass, is Snyder's
16:51:25  2   purchaser?
16:51:25  3   A.   That's correct.
16:51:26  4   Q.   And with respect to the "ship to", this
16:51:29  5   particular tank was directed to be shipped by
16:51:32  6   Snyder to the U.S. Hyundai plant in
16:51:39  7   Montgomery?
16:51:40  8   A.   That's correct. We're drop shipping
16:51:42  9   according to that address.
16:51:43 10   Q.   Do you know whether or not there was any
16:51:47 11   written warranty that was extended by Snyder
16:51:51 12   to Augusta Fiberglass or CORE-B with respect
16:51:54 13   to the purchase of the sulfuric acid tank,
16:51:58 14   written warranty?
16:51:59 15   A.   The only written warranty that I would
16:52:02 16   be aware of would be the standard warranty
16:52:05 17   that is for the sulfuric acid tanks in
16:52:10 18   general. We provide a three-year
16:52:14 19   chemical-specific warranty on this particular
16:52:16 20   type of application and that's extended to all
16:52:20 21   of our customers.
16:52:22 22   Q.   Does that go to Augusta Fiberglass as
16:52:28 23   the purchaser or does it go to the end
```

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 321

```
16:56:16  1   of Snyder's tanks?
16:56:19  2            MS. ANDREEN: Object to the
16:56:19  3   form.
16:56:20  4        A.  That's the usual arrangement.
16:56:25  5        Q.  Thank you. Would you say that, based on
16:56:28  6   your experience that this arrangement is as
16:56:30  7   frequent, more frequent, or less frequent than
16:56:32  8   delivery by Snyder direct to a customer, such
16:56:36  9   as Augusta Fiberglass?
16:56:37 10        A.  I would say it's probably more frequent.
16:56:39 11        Q.  Okay. And I'm not sure I understood
16:56:42 12   what a packing slip is and what is included as
16:56:45 13   a packing slip. Can you tell me about that,
16:56:48 14   please, sir?
16:56:48 15        A.  A packing slip is just a document that
16:56:50 16   accompanies what is being delivered. It
16:56:54 17   details, you know, what is in that particular
16:56:56 18   delivery. It should -- you know, it could be
16:57:04 19   as simple as, here is a tank and here is a
16:57:08 20   box, or it could detail the pieces inside the
16:57:12 21   box. It would kind of depend on how it was
16:57:15 22   filled out.
16:57:15 23        Q.  And that is an enclosure with the
```

Page 322

```
16:57:19  1   product at shipment?
16:57:19  2        A.  It's usually an enclosure, yes.
16:57:22  3        Q.  Is it usual for Snyder to receive any
16:57:33  4   documentation back from a user after delivery
16:57:37  5   of a tank?
16:57:39  6        A.  It's -- from the end-user?
16:57:41  7        Q.  Yes.
16:57:42  8        A.  Uh, I would not say that it's -- it's --
16:57:47  9   I would not say it's completely normal -- let
16:57:52 10   me rephrase that. I would not say that it
16:57:57 11   happens on a majority of the shipments. I
16:57:59 12   would say it is a minority that we get back
16:58:02 13   some sort of feedback or information about the
16:58:04 14   application.
16:58:05 15        Q.  Okay.
16:58:05 16        A.  And that could be including the water
16:58:08 17   pretest, which is something we ask for.
16:58:12 18        Q.  That was really where my questions were
16:58:15 19   leading. You gave some testimony, I believe,
16:58:18 20   earlier with respect to information on the
16:58:20 21   warranty statement that says, in effect, and I
16:58:25 22   am paraphrasing, "The end-user is to conduct a
16:58:29 23   water pretest and to supply the results of
```

Page 323

```
16:58:32  1   that pretest back to Snyder in order to
16:58:36  2   validate the warranty," or words to that
16:58:38  3   effect.
16:58:39  4            MS. ANDREEN: Object to the
16:58:39  5   form.
16:58:40  6        A.  Correct. There is a percentage of
16:58:43  7   people that do that, but I would not say it is
16:58:45  8   the vast majority.
16:58:46  9        Q.  Okay. Have you ever heard of an
16:59:00 10   end-user taking the position, with respect to
16:59:02 11   the delivery and pretesting of a sulfuric acid
16:59:11 12   tank, that it's not appropriate to hydrotest
16:59:14 13   it?
16:59:14 14            MS. ANDREEN: Object to the
16:59:14 15   form.
16:59:15 16        A.  We have not had anybody argue with our
16:59:20 17   pretest that I am aware of.
16:59:38 18        Q.  On the invoice that is now Defendant's
16:59:45 19   Exhibit Number 40, there is a line item down
16:59:47 20   at the bottom that identifies Item 257.
16:59:50 21        A.  Yes, sir.
16:59:50 22        Q.  IND.HYDROTEST?
16:59:54 23        A.  Uh-huh. (Witness nods head.)
```

Page 324

```
16:59:55  1        Q.  What does the IND reference?
17:00:03  2        A.  Industrial.
17:00:03  3        Q.  Industrial hydrotest?
17:00:05  4        A.  Yes.
17:00:05  5        Q.  I guess I need to make this clear in my
17:00:07  6   own mind. Tell us what the hydrotesting
17:00:12  7   process is that is reflected on this invoice
17:00:14  8   as an industrial hydrotest.
17:00:14  9        A.  Basically, the hydrotest is nothing more
17:00:18 10   than equipping the tank with the fittings that
17:00:22 11   are to remain installed during shipment, fill
17:00:25 12   the tank up with water and plugging off these
17:00:29 13   fittings with some sort of expandable plug is
17:00:32 14   typical. And once the tank is filled to
17:00:36 15   capacity, then, let it sit for a period of
17:00:38 16   time and observe for leaks for a minimal time.
17:00:40 17   And we do have different times that could be
17:00:44 18   specified. Minimal time would be four hours.
17:00:47 19   We have -- you know, based upon people's
17:00:49 20   requests, we have actually done it over a
17:00:51 21   weekend or something like that. If they want
17:00:54 22   a little more time, we will plan it out so
17:00:57 23   that it can stay up. But it occupies a
```

81 (Pages 321 to 324)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 325

17:01:00  1  certain amount of our floor space, so we have
17:01:02  2  to plan around all of that.
17:01:04  3  Q.  In the industrial hydrotest, are any of
17:01:08  4  the components that are part of the tank, is
17:01:11  5  the integrity of any of those components at
17:01:15  6  risk of compromise by virtue of the conduct of
17:01:18  7  the test?
17:01:19  8  A.  Restate that.
17:01:20  9  Q.  Okay.  When Snyder performs the
17:01:23 10  industrial hydrotest, are any of the component
17:01:28 11  parts that are attached to the tank in order
17:01:31 12  to conduct the test, at risk of being
17:01:34 13  compromised, their integrity, by virtue of the
17:01:39 14  test having been performed?
17:01:39 15  A.  In other words, the components that end
17:01:42 16  up shipping or the components we had to do the
17:01:45 17  test?
17:01:45 18  Q.  The components that would be shipped;
17:01:48 19  something that the customer would receive?
17:01:50 20  A.  Okay.  The test would basically show if
17:01:53 21  any of those components are defective or not
17:01:58 22  installed properly.  So, if we see a leak, the
17:02:00 23  water is pumped out, we take that component

Page 326

17:02:02  1  off or re-examine it, try to figure out how to
17:02:06  2  address the issue and, then, effect a repair
17:02:08  3  or change of some sort.
17:02:10  4  Q.  Is documentation supposed to be kept by
17:02:15  5  Snyder when a particular tank fails a
17:02:18  6  hydrotest?
17:02:19  7  A.  If it fails a hydrotest, it's going to
17:02:22  8  be something that we are going to say, "Okay.
17:02:25  9  Why did it fail?"  If it failed at a fitting,
17:02:29 10  we are going to take a water test down, we're
17:02:32 11  going to look at the fitting, redo it and,
17:02:33 12  then, fill it back up and see if it passes a
17:02:36 13  hydrotest.  If it failed and we could not
17:02:39 14  repair, then, that tank would be scrapped and
17:02:44 15  we would make a new tank.
17:02:46 16  Q.  I see.  But if it failed at a fitting,
17:02:49 17  in your experience, I guess from time to time
17:02:51 18  tanks fail the water test, don't they?
17:02:53 19  A.  Yes, they do.
17:02:54 20  Q.  And when a tank fails at a water test,
17:02:58 21  does Snyder have a practice to document the
17:03:00 22  fact that it failed so that there was a record
17:03:02 23  of that?

Page 327

17:03:03  1      MS. ANDREEN:  Object to the
17:03:03  2  form.
17:03:04  3  A.  They may write on the form that they had
17:03:06  4  to do something to a particular fitting, you
17:03:09  5  know, and note that.  But, they don't
17:03:12  6  necessarily do that on a regular basis.  They
17:03:15  7  might say, "Okay.  We reworked it, put it back
17:03:19  8  up, and it passed."  So, the end result is
17:03:22  9  that it has to pass.
17:03:24 10  Q.  Now, you testified earlier that, when a
17:03:30 11  purchaser requests a hydrotest, then, a
17:03:33 12  hydrotest is done?
17:03:34 13  A.  Uh-huh, (Witness nods head.)
17:03:36 14  Q.  And if a purchaser doesn't request one,
17:03:39 15  it is not done?
17:03:41 16  A.  Not done.
17:03:41 17  Q.  In this instance, there is a charge on
17:03:43 18  the invoice going from Snyder Industries to
17:03:48 19  CORE-B or Augusta Fiberglass for a hydrotest?
17:03:51 20  A.  Uh-huh.  (Witness nods head.)
17:03:52 21  Q.  Is it accurate to state that that is
17:03:55 22  Snyder's representation to Augusta Fiberglass
17:03:57 23  that, in fact, a hydrotest had been performed

Page 328

17:04:00  1  and that it passed?
17:04:02  2  A.  Yes, it is.
17:04:03  3  Q.  And the meaning of that is, that no
17:04:26  4  leaks were detected prior to shipment of the
17:04:28  5  tank to the customer?
17:04:29  6  A.  That is correct.
17:04:29  7  Q.  And the fact that this appears on the
17:04:31  8  invoice, with respect to the sulfuric acid
17:04:34  9  test that was shipped from Snyder to USFilter,
17:04:38 10  is an indication that there is no leaks
17:04:40 11  detected in this particular tank that was
17:04:43 12  shipped to USFilter?
17:04:44 13  A.  That is correct.
17:04:46 14  Q.  Has Snyder ever been asked to attend or
17:04:54 15  participate in the installation of tanks by
17:04:56 16  end-users?
17:05:00 17      MS. ANDREEN:  Object to form.
17:05:05 18  A.  I would say that there have been a
17:05:07 19  couple of occasions where we have been asked
17:05:10 20  if we would do such a practice.  Uh, we do not
17:05:15 21  do that as a normal course of business.  That
17:05:18 22  would be an unusual item.  If they wanted this
17:05:25 23  to occur, we could probably work it out at

82 (Pages 325 to 328)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**