# EXHIBIT
# SR-1

# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

|  |  |  |
|---|---|---|
| N.A. WATER SYSTEMS, LLC, as successor by merger to USFILTER ENGINEERING & CONSTRUCTION INC., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | CIVIL ACTION NO.:  2:06-CV-335-MEF/SRW |
| AUGUSTA FIBERGLASS COATINGS, INC., SNYDER INDUSTRIES, INC. | ) ) ) | |
| Defendants. | ) | |

## REPLY BRIEF TO DEFENDANT
## SNYDER'S RESPONSE TO PLAINTIFF'S MOTION TO COMPEL

Plaintiff, N.A. Water Systems, LLC ("Plaintiff" or "Water Systems"), replies as follows to the Response filed by Snyder Industries, Inc. ("Snyder") (Doc. 16) herein on September 25, 2006.  Snyder does not explain the disappearance of at least ten (10) documents from its privilege log, Snyder erroneously states that there has been an extension of the fact witness discovery cut-off of October 15, and Snyder fails to call to the Court's attention that the few documents it has produced have been produced since the filing of Plaintiff's Motion to Compel, not prior thereto.  Moreover, Snyder has failed to provide an evidentiary affidavit which would allow Plaintiff, or the Court, to determine the applicability of any privilege, notwithstanding the specific requirement of the Middle District's Guidelines to Civil Discovery Practice ("*Guidelines*"), which are specifically incorporated into the Uniform Scheduling Order (Doc. 6) herein.

1.    **Snyder has not provided evidence supporting its claim of privilege**.    The *Guidelines to Civil Discovery Practice in the Middle District of Alabama* ("*Guidelines*"), at paragraph I.I.2., requires that any claim of privilege be supported by "evidence." Snyder has failed to supply any evidence whatsoever, by affidavit or otherwise, to support its claims of privilege. Snyder has had several bites at this apple, including its receipt of a timely privilege log from Plaintiff, its meet and confer with Plaintiff, following Plaintiff's receipt of the late and inadequate log dated August 22, 2006, its second log filed on August 29, 2006, and its receipt of Plaintiff's Motion herein. Snyder invites this Court to review a brief by Plaintiff's counsel (not on behalf of Plaintiff) filed in the Southern District of Alabama. The brief itself (Exhibit 19 to Snyder's Response) reveals that the plaintiff in that case had produced "millions of pages of hard copies and electronic copies of documents" (Exhibit 19, p. 6), filed a timely privilege log, and submitted affidavits in support of the privilege assertion (Exhibit 19, p. 4). Notwithstanding that Compliance, as the Brief (Snyder Exhibit 19) itself attests, the parties engaged in substantial disputes regarding the requirements for a privilege log – which, in the Southern District of Alabama are very similar to the requirements for a privilege log in the Middle District, as set forth in the *Guidelines*, ¶ I.3.a. Documents which had either been untimely listed on a log, poorly described on a log, or inadequately supported by affidavits were challenged for waiver, with the Magistrate there taking an active role in enforcing the local rules in the Southern District and the Federal Rules of Civil Procedure.

Having failed in any way to support, with "evidence," the assertions of privilege, Snyder continues instead to ignore the requirements necessary to sustain the withholding of relevant documents as set forth in the Federal Rules of Civil Procedure, as well as in the *Guidelines*.

Moreover, Snyder now takes the position that there are ten (10) documents which were relevant on August 22, 2006, but which became, mysteriously, irrelevant for purposes of the August 29 log. At page 15 of its Response, Snyder states – apparently with respect to the missing ten (10) documents – that those documents were "inadvertently" listed in the August 22 privilege letter. (Doc. 16 at 15).

Snyder has produced no affidavit supporting this contention. Moreover, Snyder (again at page 15 of its Response, Doc. 16) states that it described these ten (10) documents because it referred generally to documents it withheld related to correspondence with the insurer or with the third-party administrator. Of course, documents regarding the insurer and the third-party administrator are listed on both the August 22 log and the August 29 log, so that the omission of the ten (10) documents remains unexplained; they have "disappeared" in Snyder's view. And all such communications appear to relate to a requirement of the policy, which is quoted below in Section 2.k.

Attached as **Exhibit SR-2** to this brief is the challenge log (which was Table 1 to Plaintiff's Brief). Each of the documents are challenged because of Snyder's failure to comply with the Federal Rules of Civil Procedure or with the *Guidelines*. These should be produced because of waiver, the grounds for which continue even to this day, nearly two months after Snyder's document production.

2.    **Snyder Continues to Withhold Documents.** In its brief, Snyder responds to other documents it failed to produce. (See, Doc. 16, p. 16 *et seq.*). Snyder states these were requested in a deposition of Snyder on August 31, 2006; that is true, but they are all documents which were first requested in Plaintiff's original request for production (June 23, 2006), as is made clear in Plaintiff's brief, at pages 8 to 10.

a.    **Cullen Estes Report or Notes From on or About September 20, 2004.**

The specific item or items, being a report or notes made by Cullen Estes, a Snyder employee, during a site visit made on September 20, 2004, have not been produced. Snyder does not deny that they exist. Instead, Snyder attacks the Plaintiff's affidavit, *not the underlying request*, and points to a document written *by Plaintiff* (Snyder Response, Exhibit 17) to establish the date for the visit. The date for the visit is not in question; the documents requested concern Mr. Estes' findings, his notes, and other observations. If it is important as to whether or not those findings, notes, or observations are denoted as a "report," Mr. Estes has been identified at page 65 of the Snyder deposition as the person who looked at the tank. Mr. Estes apparently reported back to the Snyder 30(b)(6) deponent, and provided information about his site visit to Snyder. Snyder and its counsel took the position that the document or documents with that information had been produced to Plaintiff, and did not object when that document was called a "report." *See* Deposition Excerpts attached as pp. 64-72, particularly p. 71, line 16 through p. 72, line 20. All deposition excerpts are included in **Exhibit SR-3**. This document(s) is relevant to the case; they have not been produced; it or they must be produced.

b.    **Transmittal Sheet by Snyder Sending the Result of a Shop Test to Augusta Fiberglass.** At page 207 of its deposition, Snyder testified that a transmittal to Augusta Fiberglass of the test results for the shop test of the failed tank probably existed. We now learn that no such transmittal can be found. Snyder states that it produced (on September 20, 2006) a record of a shop test for the tank at issue, after the subject Motion was filed. However, the existence of such a document is contradictory of Snyder's testimony at its deposition, where Plaintiff was told that Snyder had conducted "an exhaustive search" for the test results and "did

not find it." (**Exhibit SR-3**, pp. 207-208). Snyder should be ordered to produce the transmittal to Augusta, or to produce an affidavit setting forth the steps to search for it.

c.     **Hydrotest of Sulfuric Acid Tank.** As noted in 2(b), a "hydrotest" result was produced by Snyder in response to the Motion, on September 20, 2006. Snyder must now be re-deposed on this document and its sudden appearance. The costs of that deposition should be to Snyder's account.

d.     **Mr. Oltman's copy of Exhibit 33.** This has not been produced, but a different form from Exhibit 33 has been. Plaintiff believes it is entitled to the Snyder version of the label on the tank at issue.

e.     **MRP for the Tank at Issue.** Snyder has a computerized system for Manufacturing Resource Planning ("MRP"). It involves all of the bill of materials, it involves the scheduling of production, the production orders, and "that sort of thing." (**Exhibit SR-3**, p. 63) The excerpts from the MRP system show when a particular tank was built. (**Exhibit SR-3**, p. 210) Snyder states these documents have been produced, but, if so, they were only produced on September 20, 2006, in response to the Motion, and they are not identifiable as MRP documents. Snyder should be required to produce all of the MRP file with respect to the tank at issue and to identify the documents as such.

f.     **Electronic Data in Snyder's Tracking System Regarding the Failed Tank and Any of Its Component Parts.** Snyder states, with a reference to page 120 of its deposition, that it does not keep a record of electronic documents. The only information found on page 120 is that there is not "any electronic copy" or "recording" of hydrotesting of a tank. (*See* Snyder Response, Exhibit 16). Snyder's actual testimony about electronic documents is that they are maintained for a year, according to the individual providing the 30(b)(6). (**Exhibit SR-**

3, p. 212).  Of course, because Snyder takes the position that it anticipated litigation immediately upon being notified of this incident, then any destruction of electronic documents, regarding this tank, would have been improper, given that the tank was manufactured in November, 2003, and the catastrophic spill occurred in September, 2004.

Snyder should be ordered to produce all electronic documents regarding, reflecting, or relating to the manufacture of the tank at issue, or to produce an affidavit that the file has been destroyed, providing all information about when and the circumstance under which it was destroyed.

**g.**   **Oltman's Copy of the CED Report**.  Snyder states it is a duplicate of a produced document.  This request is moot if Snyder has confirmed Oltman's copy is an exact duplicate (including distribution notes; fax headers; other markings) of the copy produced.

**h.**   **Distributorship Agreement**.   Snyder's Response indicates that no agreement existed at the time of this sale.  At its deposition, Snyder testified that Augusta Fiberglass had been a distributor since 1995, approximately.  (**Exhibit SR-3**, p. 21).  Snyder should be required to produce the documents reflecting the distributorship relationship, whether in letters, emails, or other documents short of a "written agreement."

**i.**   **Oltman's Study of the Glue Used on the Failed Tank**.   Snyder acknowledges that these documents exist, in its Response, but it refuses to produce them.  It is clear from the deposition excerpt attached to Snyder's Response at Exhibit 16 (particularly pp. 244-245), that the glue study testified to by Snyder resulted from its review of a Root Cause analysis (the "CED Report" in Item 2.g., above) which Plaintiff had provided to Snyder in January, 2005, regarding the failed tank.  The glue study and all associated documents, emails, and related items should be produced.

1/1496112.1                                              6

j. **Drawings of the Failed Tank Component**. Snyder points to the production of drawings by Augusta Fiberglass, with its reference to Exhibits 15 and 18. However, on September 20, Snyder itself produced earlier revisions of drawings. The item is resolved as a result of the Motion.

k. **Snyder Insurance Policy**.[1] Snyder produced its policy, in response to the instant Motion on September 20, 2006.[2] That policy states, as one of its insuring conditions, as follows:

> In the event of an occurrence which in the opinion of the President or other officer of the corporation is likely to result in a claim under the policy, written notice containing particulars sufficient to identify the insured and also reasonable obtainable information with respect to the time, place, and circumstances thereof, and the names, addresses [*sic*] of the injured and of available witnesses, shall be given by or for the named insured to the company of [*sic*] any of its authorized representatives as soon as practicable after the President or other officer of the corporation has actual knowledge of the occurrence.

(**Exhibit SR-4**, which is p. 59 of the insurance policy production made on September 20, 2006.) This language demonstrates that Snyder had a business obligation to report about the accident to its insurer, which is an additional reason why Snyder's withheld documents, to the extent they concern its insurer, were improperly withheld. The policy has been produced as a result of the Motion.

l. **Snyder's Internal Hydrotest Procedure**. Snyder indicates that this has been produced. If so, it was produced in response to the instant Motion, under cover of Snyder's letter of September 20, 2006. Plaintiff is attempting to have Snyder identify precisely what Snyder refers to as the documents which have been produced.

---

[1] Snyder questions why Plaintiff used the words "possibly applicable." Plaintiff did so because the applicable F.R.Civ.P. 26(a)(1)(D) refers to insurers which "may be liable."

[2] Snyder objected to any 30(b)(6) testimony regarding insurance, **Exhibit SR-3**, pp. 292; 295-296, and had not even disclosed an insurance policy in its initial disclosures on June 15, 2006.

    **m.**    **Inspection Guidelines**.   Plaintiff's requests refer to the Inspection Guidelines, which Snyder testified to at its deposition. **(Exhibit SR-3, pp. 136-137)**. The Guidelines which Snyder refers to at page 20 of its Response are not the Inspection Guidelines.[3] Snyder produced "Inspection Criteria" in response to the Motion; Plaintiff has asked Snyder to confirm the "Criteria" are the same as the "Guidelines" Snyder testified to. Snyder must produce the "Guidelines."

    **n.**    **Shop Packet for the Failed Tank and Any of Its Component Parts**. Snyder testified that the shop packet is maintained in its "Quality" department, and further stated that it had not been produced. **(Exhibit SR-3, pp. 217-218)**. Snyder indicates in its Response this has now been produced in response to the Motion, but Plaintiff cannot identify it in any of the documents produced. As described in the Snyder deposition, this should be a clearly identifiable "packet" which would include the purchase order, the drawing for the tank, quality information, setup sheets, cut sheet, special direction, P.M. logs, and sign-off sheets **(Exhibit SR-3, p. 218)**, all in a single package or collection of documents. Snyder should be ordered to produce the shop packet, as a packet, not pieces of it here and there in its production.

    **o.**    **Bill of Material**. Snyder indicates that it has produced this document, yet Snyder was unable to identify it at its deposition from Snyder's production. **(Exhibit SR-3, p. 126)**. Snyder testified that "the tank itself should have a bill of material that we can provide to you." This document should be produced, is different from the bill of materials for the shipping list, and is for the fabrication of the tank and each component, including the failed tank component.

    **p.**    **Final Inspection Criteria for the Failed Tank and Any of Its Component Parts**. Snyder indicates that these have been produced in response to the Motion,

---

[3] There is also no evidence that the Installation Guide was shipped with the tank.

but again, Plaintiff is unable to identify any such documents. The "final inspection criteria" for the failed tank would include items such as the bill of material, the cut sheets, special instructions, reject slips, bar code system and summaries, as well as special instructions, according to Snyder's deposition. (**Exhibit SR-3**, pp. 112-113). Snyder has not identified where these documents are, if they in fact were produced. It should be ordered to produce the final inspection criteria for the failed tank, as well as for its component parts (including the component part on which the glue was improperly applied).

2.    <u>Conclusion</u>. Snyder has chosen to ignore the *Guidelines*, with respect to allegedly privileged documents, and it has made no effort to comply with those *Guidelines*, either in the description of the withheld documents, in providing evidence to support its assertions of privilege, or in citing authority for its assertions.

Furthermore, it has failed to produce a number of responsive documents, as outlined in the underlying Motion.

Plaintiff requests that Snyder be ordered to produce the documents withheld, as listed on each of its privilege logs, and that it be ordered to produce the documents which are the subject of the Motion, to the extent they in fact exist, and for the additional relief to which Plaintiff is entitled.

Respectfully submitted,

_____
E. Mabry Rogers (ROG005)
Lawyer for N.A. Water Systems, LLC

OF COUNSEL:
Rhonda Caviedes Andreen (CAV008)
Angela R. Rogers (RAI 017)
BRADLEY ARANT ROSE & WHITE LLP
One Federal Place
1819 Fifth Ave. N
Birmingham, AL 35203
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served the foregoing REPLY BRIEF TO DEFENDANT SNYDER'S RESPONSE TO PLAINTIFF'S MOTION TO COMPEL on the following parties:

Jack Owen
Ball, Ball, Matthews & Novak, P.A.
Post Office Box 2148
Montgomery, Alabama 36102-2148
(334) 387-7680
(334) 387-3222 (Fax)
Email: ccowen@ball-ball.com

Dorothy A. Powell, Esq.
Parsons, Lee & Juliano, P. C.
300 Protective Center
2801 Highway 280 South
Birmingham, AL 35223-2480
Email: dpowell@pljpc.com

by electronically filing it as Exhibit R-1 to Plaintiff's Motion and by placing a copy of same in the United States Mail, first-class postage prepaid and addressed to their regular mailing addresses, on this _____ day of _____, 2006.

_____
OF COUNSEL

# EXHIBIT
# SR-2

**TABLE 1**

**Challenge Log to Snyder Withheld Documents**

The numbered reasons at the right correspond to these reasons for production:

1.  Waiver for failure to comply with 34(b) in Response to RFP (Section B, Memo of 9/12/06);

2.  Waiver for failure to comply with timeliness requirement of 26(b)(5) (Section C, Memo of 9/12/06);

3.  No description on current log (Section F, Memo of 9/12/06)

4.  Third party distribution or no showing as to why the third party is entitled to review evidence withheld from plaintiff. (Section E, Memo of 9/12/06)

5.  No statement as to confidentiality, steps taken to protect it, or about distribution by third parties or others since creation of the document. (Section E, Memo of 9/12/06)

6.  No statement of purposes for creation of document or its transmission to others; no showing litigation was anticipated. (Section D, Memo of 9/12/06)

7.  No description of name, address, job title, and employer of one or more recipients or of why a person was included on distribution. (Section D, Memo of 9/12/06)

8.  No subject of document or no description of document. (Section D, Memo of 9/12/06)

9.  Factual statements are not subject to withholding; no attorney mental impression. (Section D, Memo of 9/12/06)

| No. | Doc Date | Doc Type | Description | Author | Recipient | CC | Other Senders or Recipients in String | 3/22/04 3/22 Letters | Reason For Withholding | Reasons Not Protected |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. | 12/2/05 | Not Stated | Internal communication | Spurrier, Mike | Hansen, Steve | Janssen, Dana Ahrens, Gary O'Connell, Tom | Not listed | 1/1 | WP | 1, 2, 5, 6, 7, 8, 9 |
| 2. | 12/1/05 | Not Stated | Internal communication | Hansen, Steve | Spurrier, Mike | Janssen, Dana Ahrens, Gary O'Connell, Tom | Not listed | 2/2 | WP | 1, 2, 5, 6, 7, 8, 9 |
| 3. | 12/1/05 | E-mail | E-mail communication from Claims Resource Management | Rodgers, Dave | Hansen, Steve | Fridholm, Kathy Struyk, Jack | Not listed | 3/3 | WP | 1, 2, 4, 5, 6, 7, 8, 9 |
| 4. | 10/18/05 | E-mail | E-mail communication | Fridholm, Kathy | Hansen, Steve | Struyk, Jack Rogers, Dave | Not listed | 4/4 | WP | 1, 2, 4, 5, 6, 7, 8, 9 |
| 5. | 10/14/05 | Not Stated | Internal communication | Ahrens, Gary | Spurrier, Mike | Hansen, Steve O'Connell, Tom Janssen, Dana Gentry, Dave Williams, Kevin | Not listed | 5/8 | WP | 1, 2, 5, 6, 7, 8, 9 |
| 6. | 10/14/05 | Not Stated | Internal communication | Spurrier, Mike | Ahrens, Gary | Hansen, Steve O'Connell, Tom Janssen, Dana | Not listed | 6/9 | WP | 1, 2, 5, 6, 7, 8, 9 |
| 7. | 10/14/05 | Not Stated | Internal communication | Ahrens, Gary | Spurrier, Mike | Hansen, Steve O'Connell, Tom Janssen, Dana | Not listed | 7/10 | WP | 1, 2, 5, 6, 7, 8, 9 |
| 8. | 2/7/05 | Not Stated | Internal communication | Spurrier, Mike | Ahrens, Gary O'Connell, Tom | Janssen, Dana Hansen, Steve Wobig, John | Not listed | 8/18 | WP | 1, 2, 5, 6, 7, 8, 9 |
| 9. | 10/14/04 | Not Stated | Internal communication | Janssen, Dana | Oltman, Darrell Spurrier, Mike | Wobig, John Hansen, Steve | Not listed | 9/21 | WP | 1, 2, 5, 6, 7, 8, 9 |
| 10. | 10/14/04 | Not Stated | Internal communication | Oltman, Darrell | Janssen, Dana Spurrier, Mike | | Not listed | 10/22 | WP | 1, 2, 5, 6, 7, 8, 9 |
| 11. | 10/14/04 | Not Stated | Internal communication | Janssen, Dana | Spurrier, Mike | Hansen, Steve Ahrens, Gary | Not listed | 11/23 | WP | 1, 2, 5, 6, 7, 8, 9 |
| 12. | 9/22/04 | Not Stated | Internal communication | Cullen | Janssen, Dana Ahrens, Gary | Pitts, Robert Givens, Dale Oltman, Darrell McDonald, Russ | Not listed | 12/19 | WP | 1, 2, 5, 6, 7, 8, 9 |
| 13. | 9/17/04 | Not Stated | Internal communication | Janssen, Dana | Complaint Team [?] | | Not listed | 13/20 | WP | 1, 2, 5, 6, 7, 8, 9 |
| 14. | 10/17/05 | E-mail | E-mail communication | Hansen, Steve | Rodgers, Dave | | Not listed | 14/5 | WP | 1, 2, 4, 5, 6, 7, 8, 9 |
| 15. | 10/16/05 | Not Stated | Internal communication | O'Connell, Tom | Spurrier, Mike Ahrens, Gary | Hansen, Steve Janssen, Dana Gentry, Dave Williams, Kevin | Not listed | 15/6 | WP | 1, 2, 5, 6, 7, 8, 9 |

Table 1, Page 2

| No. | Doc Date | Doc Type | Description | Author | Recipient | CC | Other Sender or Recipients in String | 8/22# / 8/22# Letters | Reasons for Withholding | Reasons Not Proffered |
|---|---|---|---|---|---|---|---|---|---|---|
| 16. | 10/14/05 | Not Stated | Internal communication | Spurrier, Mike | Ahrens, Gary | Hansen, Steve O'Connell, Tom Janssen, Dana Gentry, Dave Williams, Kevin | Not listed | 16/7 | WP | 1, 2, 5, 6, 7, 8, 9 |
| 17. | 8/4/05 | Not Stated | Correspondence | Fridholm, Kathy | Rodgers, Dave | Hansen, Steve Struyk, Jack | Not listed | 17/14 | WP | 1, 2, 4, 5, 6, 7, 8, 9 |
| 18. | 9/22/04 | Not Stated | Internal communication | Oltman, Darrell | Estes, Cullen Ahrens, Gary Janssen, Dana | Givens, Dale Pitts, Robert Wobig, John Lenhoff, Jason Spurrier, Mike | Not listed | 18/27 | WP | 1, 2, 5, 6, 7, 8, 9 |
| 19. | 9/22/04 | Not Stated | Internal communication | Estes, Cullen | Ahrens, Gary Janssen, Dana | Givens, Dale Pitts, Robert Wobig, John Lenhoff, Jason Spurrier, Mike | Not listed | 19/28 | WP | 1, 2, 5, 6, 7, 8, 9 |
| 20. | 9/22/04 | Not Stated | Internal communication | Ahrens, Gary | Estes, Cullen Janssen, Dana | Givens, Dale Oltman, Darrell Pitts, Robert Wobig, John Lenhoff, Jason Spurrier, Mike | Not listed | 20/29 | WP | 1, 2, 5, 6, 7, 8, 9 |
| **AUGUST 22, 2006 LETTER ONLY** | | | | | | | | | | |
| 21. | 10/14/05 | Not Stated | Internal communication | Spurrier, Mike | Ahrens, Gary | Hansen, Steve O'Connell, Tom Janssen, Dana | Not listed | __/11 | WP | 1, 2, 3, 5, 6, 7, 8, 9 |
| 22. | 10/14/05 | Not Stated | Correspondence | Rodgers, Dave | Fridholm, Kathy | Hansen, Steve Aldrich, Mary (Axis Capital) | Not listed | __/12 | WP | 1, 2, 3, 4, 5, 6, 7, 8, 9 |
| 23. | 9/22/04 | Not Stated | Correspondence | Fridholm, Kathy | Rogers, Dave | Struyk, Jack Hansen, Steve Carey, Karen (Axis Capital) | Not listed | __/13 | WP | 1, 2, 3, 4, 5, 6, 7, 8, 9 |
| 24. | 7/15/04 | Not Stated | Correspondence | Rodgers, Dave | Hansen, Steve | Fridholm, Kathy Reno, Debbie | Not listed | __/15 | WP | 1, 2, 3, 4, 5, 6, 7, 8, 9 |
| 25. | 2/23/04 | Not Stated | Correspondence | Hansen, Steve | Rodgers, Dave | | Not listed | __/16 | WP | 1, 2, 3, 4, 5, 6, 7, 8, 9 |
| 26. | 11/2/04 | Not Stated | Correspondence | Rodgers, Dave | Hansen, Steve | | Not listed | __/17 | WP | 1, 2, 3, 4, 5, 6, 7, 8, 9 |
| 27. | 10/11/04 | Not Stated | Correspondence | Fridholm, Kathy | Hansen, Steve | | Not listed | __/24 | WP | 1, 2, 3, 4, 5, 6, 7, 8, 9 |
| 28. | 10/8/04 | Claim Form | General Liability Notice of Occurrence/Claim | | | | Not listed | __/25 | WP | 1, 2, 3, 4, 5, 6, 7, 8, 9 |
| 29. | 10/14/04 | Not Stated | Correspondence | Hansen, Steve | Rodgers, Dave | | Not listed | __/26 | WP | 1, 2, 3, 4, 5, 6, 7, 8, 9 |

Table I, Page 3

| No. | Doc. Date | Doc. Type | Description | Author | Recipient | CC | Other Senders or Recipients in String | 8/29 & 8/22 Letters | Reason For Withholding | Reasons Not Protected |
|---|---|---|---|---|---|---|---|---|---|---|
| 30. | 9/17/04 | Not Stated | Internal communication | Ahrens, Gary | Olman, Darrell | | Not listed | __/30 | WP | 1, 2, 3, 5, 6, 7, 8, 9 |
| **NOT LISTED** | | | | | | | | | | |
| 31. | Unstated | Email | "Redacted" | Unstated | Unstated | | Unstated | __/__ | N/A | 1, 2, 3, 4, 5, 6, 7, 8, 9 |
| 32. | Unstated | Email | "Redacted" | Unstated | Unstated | | Unstated | __/__ | N/A | 1, 2, 3, 4, 5, 6, 7, 8, 9 |

Table 1, Page 4

# EXHIBIT
# SR-3

IN THE U. S. DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CASE NUMBER:  2:06-CV-325-MEF

N.A. WATER SYSTEMS, L.L.C., as successor

by merger to USFILTER ENGINEERING &

CONSTRUCTION, INC.

　　　　Plaintiff,

　　　　Vs.

AUGUSTA FIBERGLASS COATINGS, INC.,

SYNDER INDUSTRIES, INC.,

　　　　Defendants.


DEPOSITION OF DARRELL ALAN OLTMAN


S T I P U L A T I O N S

IT IS STIPULATED AND AGREED by and

between the parties through their respective

counsel, that the deposition of DARRELL ALAN

OLTMAN may be taken before MICKEY TURNER,

Commissioner and Notary Public at the law

offices of Bradley, Arant, Rose & White, One

1  Federal Place, 1819 Fifth Avenue North,

2  Birmingham, Alabama, on the 31st day of

3  August, 2006.

4        IT IS FURTHER STIPULATED AND AGREED

5  that the signature to and the reading of the

6  deposition by the witness is waived, the

7  deposition to have the same force and effect

8  as if full compliance had been had with all

9  laws and rules of Court relating to the taking

10 of depositions.

11       IT IS FURTHER STIPULATED AND AGREED

12 that it shall not be necessary for any

13 objections to be made by counsel to any

14 questions except as to form or leading

15 questions, and that counsel for the parties

16 may make objections and assign grounds at the

17 time of the trial, or at the time said

18 deposition is offered in evidence, or prior

19 thereto.

20       IT IS FURTHER STIPULATED AND AGREED

21 that the notice of filing of the deposition by

22 the Commissioner is waived.

23

Page 21

09:23:32  1  our customer service manager, should be able

09:23:38  2  to give you a number on that.

09:23:40  3  Q.    Is Dana a male or a female?

09:23:43  4  A.    Dana is a male.

09:23:45  5  Q.    Is Augusta Fiberglass a distributor for

09:23:54  6  Snyder?

09:23:55  7  A.    Augusta Fiberglass is one of our very

09:23:57  8  good distributors.

09:23:59  9  Q.    How long has Augusta Fiberglass been a

09:24:01  10  distributor of Snyder?

09:24:08  11  A.    Probably since 1995, as a guess.  I do

09:24:10  12  not know for sure.

09:24:11  13  Q.    And what volume of business, dollar

09:24:13  14  volume of business, does Augusta Fiberglass do

09:24:14  15  with Snyder Industries on an annual basis?

09:24:17  16  A.    Again, a guess on my part, approximately

09:24:20  17  --

09:24:20  18                MR. LEE:  Well, you don't guess.

09:24:22  19  If you've got a judgment on that, but don't

09:24:26  20  guess.

09:24:28  21  A.    Okay.  You know, it's -- their current

09:24:30  22  volume, I do not know.  I should not guess.

09:24:32  23  Q.    Would you say that their volume is a

Page 63

10:16:20  1  Industries?

10:16:20  2  A.    We do.

10:16:21  3  Q.    What type of computer systems do you

10:16:24  4  have?

10:16:24  5  A.    Just PCs.

10:16:25  6  Q.    Are they networked?

10:16:28  7  A.    They are networked.

10:16:29  8  Q.    To a file server?

10:16:31  9  A.    To a file server.

10:16:32  10  Q.    That's your business PCs you're speaking

10:16:35  11  of?

10:16:35  12  A.    Correct.

10:16:36  13  Q.    Does Snyder have operational

10:16:41  14  manufacturing electronic systems?

10:16:44  15  A.    We have a central system for MRP, which

10:16:48  16  is manufacturing resource planning.  It

10:16:52  17  involves all of the bill of material of

10:16:58  18  materials, it involves the scheduling of

10:17:00  19  production and the production of orders, that

10:17:05  20  sort of thing, Purchasing Departments and so

10:17:07  21  forth.

10:17:07  22  Q.    Did Mr. Hansen gather documents from

10:17:11  23  this MRP, manufacturing resource planning

Page 64

10:17:16   1  system, to produce?

10:17:16   2  A.      Yes, he did.

10:17:17   3  Q.      And those were produced in hard copy or

10:17:20   4  paper form?

10:17:21   5  A.      Yes, they were.

10:17:22   6  Q.      Okay.  Let's go back to Exhibit 23, if

10:17:28   7  you will, please.  If you will look at the

10:17:32   8  middle of the page, the far right-hand -- the

10:17:34   9  far left-hand, can you read to me -- it

10:17:39  10  appears, and I'll just start it where I'm

10:17:42  11  talking, as SII position.

10:17:45  12  A.      Down on the fourth line, it appears to

10:17:48  13  say SII position.

10:17:53  14  Q.      Correct.  Can you read for me that line?

10:17:55  15  A.      Tank fine.  Fitting did leak.

10:18:03  16  Q.      Okay.  Thank you.  Tank fine.  So, there

10:18:08  17  was not any damage to the tank at the site, is

10:18:10  18  that correct?

10:18:11  19  A.      Not that we're aware of directly to the

10:18:13  20  tank.

10:18:13  21  Q.      You did have someone from Snyder

10:18:17  22  Industries go to the site to look at the tank,

10:18:18  23  did you not?

Page 65

10:18:19  1  A.    They could not do anything more than put

10:18:22  2  their head in the doorway, basically.  They

10:18:24  3  were not allowed access to the tank or allowed

10:18:28  4  access to the failed component or allowed to

10:18:31  5  take any pictures.

10:18:32  6  Q.    And who was this individual?

10:18:33  7  A.    Cullen Estes.

10:18:34  8  Q.    Is that C-U-L-L-E-N?

10:18:42  9  A.    C-U-L-L-E-N, yes.

10:18:42  10  Q.    So, when Mr. Estes went to the site --

10:18:45  11  when did he go to the site?

10:18:48  12  A.    I've got a document that probably says

10:18:54  13  here for you.

10:18:56  14             MS. POWELL:  Just answer.

10:18:59  15             MR. LEE:  Just answer the

10:19:00  16  question.

10:19:00  17  A.    I don't know the exact date.

10:19:02  18             MR. ROGERS:  Does he have a

10:19:03  19  document?

10:19:03  20  Q.    Do you have a document with you that

10:19:05  21  would help you determine that date?

10:19:07  22  A.    I think there's a document that has been

10:19:09  23  produced to you that would show that date.

10:19:12  1 Q.    Would that be in the production from

10:19:17  2 Snyder Industries to us?

10:19:18  3 A.    That would be correct.

10:19:18  4 Q.    Now, you started to reach for a document

10:19:21  5 that you brought into the deposition with you,

10:19:24  6 is that correct?

10:19:24  7 A.    I started to reach for something that

10:19:26  8 was produced to you.

10:19:27  9 Q.    So, if it has been produced in this

10:19:30 10 litigation, I don't see any reason why you

10:19:32 11 can't look at it and tell me what it was, the

10:19:35 12 answer to my question.

10:19:36 13                MS. POWELL:  Then, give us -- if

10:19:37 14 you have the documents that have been

10:19:39 15 produced, we will look through them and give

10:19:42 16 it to you.

10:19:44 17                THE WITNESS:  Right.

10:19:44 18                MS. ANDREEN:  He brought the

10:19:45 19 documents with him to the deposition.

10:19:47 20                MR. ROGERS:  This is so absurd.

10:19:49 21 That man had a file folder in his hand.  The

10:19:52 22 lawyer reached over and told him not to look

10:19:53 23 at it.

10:19:54  1              MR. LEE:  That's exactly right.

10:19:57  2              MR. ROGERS:  Well, the document

10:19:57  3 is in the room.  Let's go ahead and have him

10:19:59  4 look at it.  We're not going to have him paw

10:20:01  5 through the document production.  You've

10:20:03  6 already done that with him this morning

10:20:05  7 outside of our presence.

10:20:07  8              MR. LEE:  If you've got a

10:20:08  9 document you want to show him, that's fine.

10:20:10  10             MR. ROGERS:  We want everything

10:20:11  11 in his briefcase, then.

10:20:13  12             MR. LEE:  Well, you're not going

10:20:15  13 to get it.  You're not going to get it.

10:20:16  14             MS. ANDREEN:  He bought it to

10:20:18  15 the deposition.  This is a 30(b)(6) and a

10:20:22  16 30(b)(5) to bring documents in his possession

10:20:25  17 to this deposition.

10:20:25  18             MR. LEE:  You've already

10:20:26  19 questioned him about whether he had any

10:20:26  20 documents to be produced and they've already

10:20:30  21 been produced.

10:20:31  22 Q.   Can you answer the question, my original

10:20:33  23 question, when was Cullen Estes at the site?

10:20:39  1  A.    I do not know the exact date.

10:20:41  2  Q.    Do you know the approximate date?

10:20:43  3  A.    I know it was in late 2003.

10:20:45  4  Q.    Late 2003?

10:20:48  5             MR. ROGERS:  Before the spill?

10:20:50  6  A.    No, after the spill.

10:20:51  7  Q.    What was the date of the spill?

10:20:53  8  A.    It was in 2003.

10:20:55  9  Q.    The tank was manufactured when?

10:20:56 10  A.    Maybe I'm confused.

10:21:01 11  Q.    Take your time.

10:21:05 12  A.    I would suggest looking back on your

10:21:08 13  documents that have been produced.

10:21:10 14  Q.    You have been designated as the 30(b)(6)

10:21:19 15  representative with knowledge to answer the

10:21:21 16  questions related to the topics set forth in

10:21:26 17  the notice that we looked at, which was marked

10:21:29 18  as, I believe, Exhibit 21 --

10:21:29 19             MR. ROGERS:  22.

10:21:32 20  Q.    -- 22, excuse me.

10:21:33 21  A.    And I do not recall the exact dates.

10:21:36 22  Q.    Okay.  We'll come back to this.

10:21:45 23    This document is dated what, the

10:21:45  1 document Exhibit 23?

10:21:47  2 A.    Exhibit 23 is dated 10-15-04.

10:21:52  3 Q.    I want to go back to your statement that

10:22:07  4 you made.

10:22:07  5              MS. ANDREEN:  And, Mickey, could

10:22:08  6 you read back his response regarding the

10:22:12  7 investigation at the site?  He was discussing

10:22:17  8 what Mr. Cullen Estes was able to do at the

10:22:21  9 site.  Would you please read that back?

10:22:53 10

10:22:53 11         (Whereupon, the desired portion of

10:22:53 12          the proceeding was read back.)

10:22:54 13

10:22:54 14 Q.    Okay.  Stick his head in the door.

10:22:58 15 A.    To the room.

10:23:00 16 Q.    To the room.  So, it is Snyder

10:23:06 17 Industries' position that they sent a

10:23:07 18 representative to the spill site and he was

10:23:08 19 not allowed to walk in the building where the

10:23:11 20 tanks were?

10:23:12 21 A.    There was still sulfuric acid in the

10:23:15 22 building.

10:23:16 23 Q.    Approximately, then, how close to the

10:23:18  1  tank could he get?

10:23:20  2  A.    I do not know.

10:23:21  3  Q.    Is it your testimony you cannot identify

10:23:29  4  the handwriting on Exhibit 23?

10:23:31  5  A.    Not conclusively.

10:23:34  6  Q.    Whose handwriting do you think it is?

10:23:41  7  A.    It would be speculation for me to say.

10:23:45  8  Q.    Whose handwriting do you believe, in

10:23:47  9  your best judgment, that this is?

10:23:49  10 A.    It is possible that this handwriting is

10:24:02  11 Steve Hansen's.

10:24:03  12 Q.    And Steve Hansen was the individual you

10:24:09  13 mentioned earlier?

10:24:10  14 A.    Correct.

10:24:11  15 Q.    And his title again?

10:24:12  16 A.    Director of Human Resources.

10:24:15  17 Q.    The fifth line states, as you read

10:24:23  18 previously, "Fitting did leak".  And this is

10:24:27  19 under SII's position.  So, is it the position

10:24:31  20 of Snyder Industries that their fitting did

10:24:36  21 leak?

10:24:37  22 A.    That's what was recorded by N.A. Water.

10:24:41  23 Q.    Is that the position of Snyder

10:24:45  1  Industries?

10:24:45  2  A.    After information was provided, the

10:24:48  3  actual fitting on the tank that was installed

10:24:51  4  on the tank, did not leak.  What leaked was

10:24:55  5  the accessory that was installed to that

10:24:59  6  fitting.

10:25:00  7  Q.    Was that a Snyder Industries accessory?

10:25:03  8  A.    Yes, that is a Snyder Industries

10:25:06  9  accessory.

10:25:07  10  Q.    And did that Snyder Industries accessory

10:25:11  11  leak?

10:25:11  12  A.    The flange on that particular accessory

10:25:16  13  came off.

10:25:17  14  Q.    And that flange was installed by who?

10:25:24  15  A.    By Snyder Industries.

10:25:27  16  Q.    Back to your comment regarding Cullen

10:25:47  17  Estes' visit to the site where he was only --

10:25:53  18  and I'm paraphrasing -- allowed to stick his

10:25:57  19  head in the door, how do you know that?

10:26:00  20  A.    That is what was communicated.

10:26:02  21  Q.    Communicated to who?

10:26:04  22  A.    By Cullen Estes.

10:26:06  23  Q.    To who?

Page 72

10:26:07  1 A.    To me.

10:26:08  2 Q.    He told you that?

10:26:08  3 A.    Yes.

10:26:09  4 Q.    Did he tell you this in an e-mail?

10:26:11  5 A.    No.  It's, I believe, in a document that

10:26:13  6 was produced to you.

10:26:14  7 Q.    You believe the document was produced to

10:26:19  8 me that Cullen was only allowed to stick his

10:26:22  9 head in the door?

10:26:23 10 A.    That he was given limited access.

10:26:26 11 Q.    Well, now that's a little bit different.

10:26:30 12 Limited access versus sticking one's head in

10:26:34 13 the door, which was it?  Was he given limited

10:26:37 14 access or was he only allowed to stick his

10:26:39 15 head in the door?

10:26:41 16 A.    I think they're the same.

10:26:43 17 Q.    You got this report from Cullen.  Did

10:26:47 18 you speak to him directly, verbally?

10:26:56 19 A.    I have had direct conversations with

10:26:58 20 Cullen.

10:26:59 21 Q.    At the time that Cullen was at the site?

10:27:01 22 A.    After he came back from the site.

10:27:03 23 Q.    Were these in-person conversations?

11:41:14  1  located?

11:41:14  2  A.    Our inspection guidelines.

11:41:19  3  Q.    Inspection guidelines.  Okay.  You had

11:41:25  4  listed, told us, that in this particular

11:41:32  5  document, Exhibit 26, that this also contains

11:41:35  6  Snyder's internal hydrotest procedure.  Can

11:41:39  7  you please show me, in this document, where

11:41:41  8  that is?

11:41:41  9  A.    It talks about it but does not have the

11:41:44 10  procedure.  I thought it did.  I am mistaken.

11:41:49 11  Q.    Where does it talk about it?

11:41:51 12  A.    It would have been included underneath

11:42:34 13  the inspection and testing criteria.

11:42:37 14  Q.    What page are you looking at, may I ask?

11:42:44 15  A.    I am looking at 00095.

11:42:46 16  Q.    And it would be included where, sir?

11:42:54 17  A.    Where it is referred to is actually kind

11:42:57 18  of hard to figure out, because it's underneath

11:43:00 19  special instructions, which is a purchased

11:43:02 20  hydrotest, so it would have been a special

11:43:05 21  instruction on the order.

11:43:06 22  Q.    Could you point out exactly on that page

11:43:09 23  where you're seeing that information?

11:43:10   1  A.     If you look at the final inspection

11:43:12   2  underneath 4.10.5.3.

11:43:20   3  Q.     Could you read that for the record,

11:43:22   4  please?

11:43:22   5  A.     Includes the bill of material, cut

11:43:29   6  sheets, special instructions, reject slips,

11:43:32   7  bar code system and summaries.

11:43:35   8  Q.     I didn't hear hydrotest in that.

11:43:37   9  A.     No.  It's special instructions, is what

11:43:40   10 they are referring to it as.

11:43:41   11 Q.     So, special instructions is the

11:43:45   12 hydrotest?

11:43:46   13 A.     Hydrotest that is called out on the

11:43:48   14 order.

11:43:48   15 Q.     Is special instructions anything other

11:43:53   16 than the hydrotest?

11:43:59   17 A.     It could be.

11:44:00   18 Q.     So, a hydrotest is a special

11:44:03   19 instruction?

11:44:03   20 A.     Uh-huh.  (Witness nods head.)

11:44:03   21 Q.     It's not standard?

11:44:05   22 A.     It's ordered by the customer.  It's

11:44:07   23 something that the customer could order to

Page 126

11:59:16  1              THE WITNESS:  Down, with no

11:59:16  2 skips.  I've accounted for all of them in

11:59:19  3 these papers (indicating).

11:59:20  4 Q.    So, °the bill of material, we do not have

11:59:22  5 a bill of material for Item 8210-45, which is

11:59:28  6 the tank itself?

11:59:29  7 A.    The tank itself should have a bill of

11:59:32  8 material that we can provide to you.  The next

11:59:35  9 item down, 00017, there is no bill of

11:59:39 10 material.  That is a notation for protective

11:59:43 11 packaging.  And then, the 000257 hydrotest is

11:59:49 12 another notation.  There is no bill of

11:59:52 13 material attached to that, also.

11:59:54 14              MS. ANDREEN:  Okay.  I would

11:59:55 15 like to request from counsel the bill of

11:59:58 16 material that supports Line Item 8210-45,

12:00:02 17 which is, in fact, the sulfuric acid tank in

12:00:07 18 question in this litigation.

12:00:08 19 Q.    Do you happen to have that bill of

12:00:11 20 material with you today?

12:00:11 21 A.    No, I do not.

12:00:12 22 Q.    Thank you.  All right.  Looking at

12:00:15 23 Exhibit 27, which is the bill of material,

Page 136

12:09:53  1  A.    Yes.

12:09:53  2  Q.    Why did you specifically call Russ

12:09:56  3  McDonald?

12:09:56  4  A.    Because I thought he would be sitting at

12:09:59  5  his desk.

12:09:59  6  Q.    Why did you think that?

12:10:01  7  A.    Time of day.

12:10:02  8  Q.    Is there any other reason you would have

12:10:04  9  called Russ McDonald, as opposed to John Doe?

12:10:08  10  A.    Just a knowledgeable person that sits at

12:10:10  11  his desk at this time of day.

12:10:13  12  Q.    What is his title?

12:10:14  13  A.    He's a quality supervisor.

12:10:15  14  Q.    And is he in the Nebraska headquarters?

12:10:18  15  A.    Yes, he is.

12:10:19  16  Q.    Okay.  You mentioned, then, after a

12:10:22  17  phone call to Mr. McDonald, that the Snyder

12:10:28  18  internal hydrotest procedure could actually be

12:10:31  19  found in the inspection guidelines, is that

12:10:33  20  correct?

12:10:34  21  A.    That is correct.

12:10:34  22  Q.    Have the inspection guidelines been

12:10:44  23  produced in this litigation?

12:10:45  1  A.    I have not seen it in the packet that I

12:10:49  2  have looked at.  I do not know.

12:10:51  3  Q.    If I provide you with all of the

12:10:53  4  documents that Snyder has produced, would you

12:10:55  5  tell me if it has been produced, sir?

12:10:58  6  A.    I can look through it.

12:10:59  7           MS. ANDREEN:  Can we go off the

12:11:01  8  record, please, while he searches for this

12:11:04  9  document?

12:11:22  10           MR. LEE:  While he's doing that,

12:11:24  11  I do want to go back on the record, because I

12:11:26  12  owe you an apology.  When I made reference to

12:11:32  13  its being documented in Mr. Estes' visit to

12:11:36  14  the site, there was a letter of February 21st

12:11:39  15  of '05, from Gary Ahrens to Craig Winningham.

12:11:45  16  It's Document Number 00122.  I thought that it

12:11:50  17  specified that.  It does not.  It just simply

12:11:54  18  says representative and it is undated.

12:11:56  19           MR. ROGERS:  Thank you very much

12:11:57  20  for that apology.  I'm not sure it is one.

12:12:00  21  But we're going to have this witness find what

12:12:02  22  you described that I had overlooked and, that

12:12:05  23  is, a handwritten note about the visit by Mr.

Page 207

14:11:01  1 user, is requesting a copy of any

14:11:05  2 documentation regarding factory tests?

14:11:09  3 A.    Uh-huh. (Witness nods head.)

14:11:12  4 Q.    Did you provide that to them?

14:11:14  5 A.    I believe we did.

14:11:15  6 Q.    Well, then, why don't you have it to

14:11:18  7 produce now?

14:11:19  8 A.    Between then and now, time has elapsed,

14:11:22  9 and somewhere the information has been lost.

14:11:24 10 Q.    So, if you had provided it, then, there

14:11:31 11 would be a transmittal of it being provided,

14:11:34 12 correct?

14:11:34 13 A.    There probably was, yes.

14:11:35 14 Q.    So, you're telling me that every copy of

14:11:40 15 the Inspection Checklist for Industrial and

14:11:47 16 Skid Tanks, or whatever it was titled, has

14:11:48 17 been, lost not only by Snyder Industries, but

14:11:51 18 by Augusta Fiberglass and N.A. Water Systems?

14:11:57 19                    MR. OWEN:  I object to the form.

14:12:00 20 A.    I cannot speak for them.  I can only

14:12:02 21 speak that we did an exhaustive search and did

14:12:06 22 not find it.

14:12:07 23 Q.    When did you do an exhaustive search?

14:12:10  1 A.      When documentation was requested, we did

14:12:12  2 a documentation search.

14:12:13  3 Q.      So, when you received this from your

14:12:21  4 business partner, Augusta Fiberglass, wherein

14:12:27  5 N.A. Water Systems is requesting documentation

14:12:31  6 of the factory test, which would be in

14:12:34  7 compliance, would you agree with me, in your

14:12:38  8 Quality Assurance Manual, and I quote that,

14:12:40  9 Quality and operations document all inspection

14:12:43 10 tests and upon request will supply to the

14:12:45 11 customer evidence of same and provide all

14:12:49 12 certifications required, that you did provide

14:12:52 13 this to Augusta Fiberglass?

14:12:53 14 A.      Yes.

14:12:53 15 Q.      Thank you, sir.  If you would, sir,

14:14:12 16 still on Exhibit 26, Snyder's Quality

14:14:16 17 Assurance Manual, turn to page 000081.

14:14:19 18 A.      Okay.

14:14:19 19 Q.      The title of this page is "4.2 Quality

14:14:25 20 System".  The bottom of the page, the last

14:14:28 21 paragraph, 4.2.3.2, "In addition to the

14:14:35 22 overall quality plan, there is a daily work

14:14:38 23 plan, which changes based on production

14:15:54  1 Q.    -- you have nothing to show me?

14:15:56  2 A.    The only thing we would be able to show

14:15:59  3 you would be like work orders from production,

14:16:02  4 orders from the customers themselves going

14:16:05  5 through our MRP System.  That would be about

14:16:08  6 it.

14:16:08  7 Q.    Is there a printout from your MRP System

14:16:12  8 for the date of the production and assembly

14:16:15  9 work involved in this tank that is at issue

14:16:22 10 and the component parts at issue?

14:16:25 11 A.    There would not be anything that is

14:16:27 12 going to say who or what, you know, built

14:16:32 13 these parts, as you say, or who built these

14:16:35 14 parts, as you say.  You know, they could go

14:16:39 15 back and maybe say, "These tanks were produced

14:16:42 16 on this day."

14:16:43 17 Q.    So.  The question that I asked is:  Is

14:16:49 18 there any documentation that would tell me

14:16:51 19 what went on, on those particular

14:16:53 20 manufacturing days, and your answer is, yes,

14:16:56 21 there is?

14:16:56 22 A.    There is -- there is as far as certain

14:16:59 23 tanks were produced, yes.

Page 212

14:18:00  1  Q.    When would they have been destroyed?

14:18:04  2  A.    I think they are only kept for maybe a

14:18:08  3  year and that's it.  The paper copies are kept

14:18:11  4  for five years.

14:18:12  5  Q.    Paper copies are kept for five years.

14:18:15  6  That is Snyder Industries' standard retention

14:18:22  7  plan is five years?

14:18:23  8  A.    Five years.

14:18:24  9  Q.    Electronic files are maintained for you

10  only one year?

11  A.    I'm not totally sure of that, but that's

12  my thought at this moment.

13  Q.    That's your thought?

14  A.    That's my thought.

15  Q.    Personally?

16  A.    Personally.

17  Q.    Is there somewhere we could find out

18  what the position of Synder Industries is as

19  far as retention of electronic documents

20  within the company?

21  A.    We'll request that information, as you

14:18:49  22  already did.

14:18:50  23  Q.    If that electronic information has been

14:24:01   1  page.

14:24:01   2  A.     Okay.

14:24:02   3  Q.     It's dealing with operations.  What is

14:24:06   4  operations, as defined by Snyder Industries?

14:24:08   5  A.     Operations is referring to the

14:24:10   6  production components of the company; the

14:24:13   7  parts of the company that actually produce the

14:24:16   8  rotationally molded products.

14:24:18   9  Q.     Okay.  This paragraph refers to a

14:24:21  10  packet.

14:24:26  11  A.     Uh-huh.  (Witness nods head.)

14:24:27  12  Q.     Can you explain what that packet is?

14:24:29  13  A.     This packet is the assembly of

14:24:32  14  information that we discussed earlier, which

14:24:34  15  would include the order, the drawing for the

14:24:37  16  tank, uh, you know, any kind of quality

14:24:40  17  information, uh, that sort of thing.

14:24:43  18  Q.     And is that packet maintained in

14:24:52  19  Snyder's files?

14:24:53  20  A.     That packet is maintained -- uh, that

14:24:56  21  packet is maintained in Quality.  Quality will

14:25:01  22  maintain that file, yes.

14:25:02  23  Q.     Has that packet been produced?

14:25:04   1  A.      It's --

14:25:08   2  Q.      In this litigation?

14:25:09   3  A.      I think that's the information that's

14:25:10   4  missing; part of the information that's

14:25:13   5  missing.

14:25:15   6              MS. ANDREEN:  I specifically

14:25:17   7  request of counsel that the packet that

14:25:22   8  Mr. Oltman just described be produced.

14:25:25   9  Q.      Sir, if you would look down at the

14:25:32  10  middle of that page, page 00094, Paragraph

14:25:36  11  4.9.5.2, it begins "Operations", once again.

14:25:42  12  A.      Uh-huh.  (Witness nods head.)

14:25:43  13  Q.      Shop packets, which I believe is the

14:25:45  14  packet.

14:25:45  15  A.      Uh-huh. (Witness nods head.)

14:25:46  16  Q.      Is that the packet we were just

14:25:48  17  discussing?

14:25:48  18  A.      That's the packet, yes.

14:25:49  19  Q.      So, the shop packet, which included,

14:25:52  20  bills of material, setup sheets, cut sheet,

14:25:55  21  special directions, P.M. logs and sign-off

14:26:00  22  sheets.

14:26:00  23  A.      That's incorrectly written.  It should

Page 292

16:14:53  1  the defense costs in this matter?

16:14:56  2  A.    I do not know that, either.

16:14:58  3  Q.    Does Snyder Industries know if there is

16:15:02  4  any dispute over coverage with the insurance

16:15:07  5  carrier on this matter?

16:15:08  6              MS. POWELL:  I object.  I don't

16:15:10  7  understand the relevance.  What is the

16:15:11  8  relevance of any of this?

16:15:13  9              MS. ANDREEN:  The relevance is,

16:15:14  10  under the Federal Rules of Civil Procedure,

16:15:17  11  Snyder Industries is obligated to let the

16:15:19  12  parties know if there is any insurance

16:15:22  13  available in this litigation and they have not

16:15:25  14  done so, yet there is correspondence with

16:15:28  15  insurance carriers.  And, furthermore, we just

16:15:31  16  received a letter from counsel saying they are

16:15:35  17  withholding privileged documents with an

16:15:37  18  insurance carrier.

16:15:39  19              MS. POWELL:  Show me the portion

16:15:40  20  of the federal rules that you're talking

16:15:42  21  about.

16:15:44  22              MS. ANDREEN:  Ma'am, I don't

16:15:46  23  have a copy of the federal rules in here.

Page 295

16:19:29  1                    MS. ANDREEN:  Back on the

16:19:31  2 record.

16:19:31  3 Q.    Mr. Oltman, you stated that you do not

16:19:33  4 have any knowledge, other than there may be an

16:19:36  5 insurance policy for Snyder Industries.  Who

16:19:38  6 in your organization would better be -- would

16:19:41  7 have more knowledge as to the insurance

16:19:44  8 maintained by Snyder Industries?

16:19:46  9 A.    That would be Steve Hansen.

16:19:50 10 Q.    So, Steve Hansen would be able to

16:20:11 11 discuss, as requested in the 30(b)(5) and

16:20:15 12 30(b)(6) notice, documents which were

16:20:18 13 requested below, which happen to say Item

16:20:22 14 Number 3 -- this is Exhibit Number 22 -- all

16:20:25 15 documents by and between Snyder and its

16:20:31 16 insurance carrier related to the incident made

16:20:32 17 the basis of this litigation?

16:20:33 18 A.    Yes.

16:20:33 19 Q.    You are here today as the 30(b)(6)

16:20:36 20 representative, but you are not prepared to

16:20:38 21 testify as to that topic?

16:20:40 22 A.    No.

16:20:40 23                    MS. POWELL:  And we asserted

Page 296

16:20:42   1  objections to that topic.

16:20:45   2              MS. ANDREEN:  Noted.  We'll

16:20:48   3  reserve the right to further explore the

16:20:53   4  insurance matter with a 30(b)(6) deponent from

16:20:57   5  Snyder Industries.  I don't have any further

16:20:57   6  questions right now.  I reserve the right to

16:21:02   7  follow-up if there's any time left after Jack.

           8

           9              (Whereupon, a recess was taken at 3:21

          10              P.M. and deposition resumed at 3:28

          11              P.M.)

          12

16:28:47  13  EXAMINATION BY MR. OWEN:

16:28:47  14  Q.    Mr. Oltman, my name is Jack Owen.  I

16:28:57  15  represent Augusta Fiberglass in this

16:29:00  16  proceeding.  And like Ms. Andreen, I will be

16:29:07  17  asking you a few questions that I hope are

16:29:10  18  intelligible, but I make no warranty about

16:29:12  19  that.  So, if they are not, I would hope and

16:29:15  20  expect you to interrupt me, and ask me to

16:29:17  21  repeat or rephrase the question until you are

16:29:20  22  sure that you understand what I've asked you

16:29:22  23  to answer.

# EXHIBIT
# SR-4

| Named Insured SNYDER INDUSTRIES, INC. | | |
|---|---|---|
| **Policy Number** ECP700331-04 | **Policy Period** 08/01/2004  to  08/01/2005 | **Effective Date of Endorsement** 08/01/2004 |
| **Issued by** AXIS Surplus Insurance Company | | |

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# NOTICE OF OCCURRENCE

This endorsement modifies insurance provided under the following:

### COMMERCIAL GENERAL LIABILITY COVERAGE PART
### PRODUCTS/COMPLETED OPERATIONS COVERAGE PART

It is agreed that the condition entitled "Insured's duties in the event of Occurrence, Claim, or Suit" is amended to read:

In the event of an occurrence which in the opinion of the president or other officer of the corporation is likely to result in a claim under the policy, written notice containing particulars sufficient to identify the insured and also reasonable obtainable information with respect to the time, place, and circumstances thereof, and the names addresses of the injured and of available witnesses, shall be given by or for the named insured to the company of any of its authorized agents as soon as practicable after the president or other officer of the corporation has actual knowledge of the occurrence.

### ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Snyder -- Ins. Policy
00059